Edwin S. MALMED, Stanley L. Kubacki, Gregory G. Lagakos, Joseph T. Murphy, and James L. Stern, Plaintiffs,

v.

Richard L. THORNBURGH, Individually and as Governor of Pennsylvania, Ethel D. Allen, Individually and as Secretary of the Commonwealth of Pennsylvania, Robert E. Casey, Individually and as Treasurer of the Commonwealth of Pennsylvania, and Alexander F. Barbieri, Individually and as Pennsylvania State Court Administrator, Defendants.

Civ. A. No. 78–1418.

United States District Court, E. D. Pennsylvania.

Sept. 21, 1979.

Stephen M. Feldman, Philadelphia, Pa., for plaintiffs.

Joseph K. Hegedus, Deputy Atty. Gen., Harrisburg, Pa., for Thornburgh, Allen and Casey.

Jonathan Vipond, III, Philadelphia, Pa., for Barbieri.

## ADJUDICATION

DITTER, District Judge.

Plaintiffs in this case are five judges of the Court of Common Pleas of the First Judicial District of Pennsylvania, which consists of the County of Philadelphia. They brought this action to challenge the Pennsylvania Constitution's requirement that all state court justices, judges, and justices of the peace retire at age 70. The complaint charges that this provision violates the plaintiffs' rights to both due process and equal protection of the laws as secured by the Constitution of the United States. Plaintiffs ask me to declare that the mandatory retirement section of the Pennsylvania Constitution is null and void and that the defendant state officials should be enjoined from enforcing it.

■ This case was tried without a jury. After considering all the evidence, as well as the briefs and arguments of counsel, I conclude that the first sentence of Article V, Section 16(b) of the Pennsylvania Constitution is in conflict with both the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, at least insofar as it applies to judges of the Courts of Common Pleas. This provision is therefore null and void, and its enforcement, as to Common Pleas Court judges, must be enjoined.

My holding is based upon the following

## FINDINGS OF FACT

1. Plaintiff, Edwin S. Malmed, is a Judge of the Court of Common Pleas of the First Judicial District of Pennsylvania, composed of the County of Philadelphia, and was first appointed a Judge of the Court of Common Pleas on December 30, 1971. Plaintiff Malmed holds office by virtue of election in November, 1973, and pursuant to a Commission issued by the Governor of Pennsylvania on December 10, 1973, which certified plaintiff Malmed's right to hold said office from the first Monday of January, 1974.[1]

2. Plaintiff Malmed will attain his seventieth birthday on January 2, 1982.

3. Plaintiff, Stanley L. Kubacki, is a Judge of the Court of Common Pleas of the First Judicial District of Pennsylvania, composed of the County of Philadelphia, and was first appointed a Judge of the Court of Common Pleas on December 30, 1971. Plaintiff Kubacki holds office by virtue of election in November, 1973, and pursuant to a Commission issued by the Governor of Pennsylvania on December 10, 1973, which certified plaintiff Kubacki's right to hold said office from the first Monday of January, 1974.

4. Plaintiff Kubacki will attain his seventieth birthday on August 25, 1985.

5. Plaintiff, Gregory G. Lagakos, is a Judge of the Court of Common Pleas of the First Judicial District of Pennsylvania, composed of the County of Philadelphia. Plaintiff Lagakos was appointed as a Judge of the County Court of Philadelphia on August 26, 1965, and elected in November, 1965, for a ten year term commencing in January 1966. On January 1, 1969, by virtue of an amendment of the Pennsylvania Constitution, plaintiff Lagakos became a Judge of the Court of Common Pleas for a term to be completed in January 1976. Plaintiff Lagakos was retained in an election in November, 1975, and currently holds office by virtue of such election and pursuant to a Commission issued by the Governor of Pennsylvania on December 17, 1975, which certified plaintiff Lagakos' right to hold said office from the first Monday of January, 1976.

1. By a stipulation of counsel dated April 16, 1979, it was agreed that certain of the facts set forth in these findings are true and correct. In most instances, these agreed findings have been adopted verbatim.

6. Plaintiff Lagakos will attain his seventieth birthday on October 16, 1982.

7. Plaintiff, Joseph T. Murphy, is a Judge of the Court of Common Pleas of the First Judicial District of Pennsylvania composed of the County of Philadelphia. Plaintiff Murphy was appointed as a Judge of the Municipal Court of Philadelphia County on December 27, 1968. In November, 1969, plaintiff Murphy was elected as a Judge of the Municipal Court of Philadelphia County for a six-year term commencing in January, 1970. On December 31, 1971, plaintiff Murphy was appointed as Judge of the Court of Common Pleas. Plaintiff Murphy currently holds office by virtue of election in November, 1973, and pursuant to a Commission issued by the Governor of Pennsylvania on December 10, 1973, which certified plaintiff Murphy's right to hold said office from the first Monday of January, 1974.

8. Plaintiff Murphy will attain his seventieth birthday on October 21, 1980.

9. Plaintiff, James L. Stern, is a Judge of the Court of Common Pleas of the First Judicial District of Pennsylvania composed of the County of Philadelphia. Plaintiff Stern was appointed as a Judge of the County Court of Philadelphia in June, 1964, and elected, in November, 1965, for a ten-year term commencing in January, 1966. On January 1, 1969, by virtue of an amendment of the Pennsylvania Constitution, plaintiff Stern became a Judge of the Court of Common Pleas for a term to be completed in January 1976. Plaintiff Stern was retained in an election in November 1975, and currently holds office by virtue of such election and pursuant to a Commission issued by the Governor of Pennsylvania on December 17, 1975, which certified his right to hold said office from the first Monday of January 1976.

10. Plaintiff Stern will attain his seventieth birthday on January 26, 1980.

11. Defendant Richard L. Thornburgh is the Governor of the Commonwealth of Pennsylvania.

12. Defendant Ethel D. Allen is the Secretary of the Commonwealth of Pennsylvania.

13. Defendant Robert E. Casey is the Treasurer of the Commonwealth of Pennsylvania.

14. Defendant Alexander F. Barbieri is the Court Administrator of the Commonwealth of Pennsylvania.

15. Article V, Section 15 of the Pennsylvania Constitution (Adopted in 1968 to be effective January 1, 1969) provides for the tenure and election of judges and justices as follows:

(a) The regular term of office of justices and judges shall be ten years and the regular term of office for judges of the municipal court and traffic court in the City of Philadelphia and of justices of the peace shall be six years. The tenure of any justice or judge shall not be affected by changes in judicial districts or by reduction in the number of judges.

(b) A justice or judge elected under section thirteen (a), appointed under section thirteen (d) or retained under this section fifteen (b) may file a declaration of candidacy for retention election with the officer of the Commonwealth who under law shall have supervision over elections on or before the first Monday of January of the year in which his term of office expires. If no declaration is filed, a vacancy shall exist upon the expiration of the term of office of such justice or judge, to be filled by election under section thirteen (a) or by appointment under section thirteen (d) if applicable. If a justice or judge files a declaration, his name shall be submitted to the electors without party designation, on a separate judicial ballot or in a separate column on voting machines, at the municipal election immediately preceding the expiration of the term of office of the justice or judge, to determine only the question whether he shall be retained in office. If a majority is against retention, a vacancy shall exist upon the expiration of his term of

office, to be filled by appointment under section thirteen (b) or under section thirteen (d) if applicable. If a majority favors retention, the justice or judge shall serve for the regular term of office provided herein, unless sooner removed or retired. At the expiration of each term a justice or judge shall be eligible for retention as provided herein, subject only to the retirement provisions of this article.

16. Article V, Section 16(b) of the Pennsylvania Constitution (Adopted in 1968) to be effective January 1, 1969) provides:

(b) Justices, judges and justices of the peace shall be retired upon attaining the age of seventy years. Former and retired justices, judges and justices of the peace shall receive such compensation as shall be provided by law. No compensation shall be paid to any justice, judge or justice of the peace who is suspended or removed from office under section eighteen of this article or under article six.

17. Defendant Thornburgh in accordance with Article V, Section 13(b) of the Pennsylvania Constitution nominates and, with the advice and consent of two-thirds of members elected to the Senate, appoints a justice or judge to fill a vacancy in the office of justice or judge. Act of April 9, 1929, P.L. 177, No. 175 § 207.1 as added to by Act of November 8, 1976, P.L. 1109, No. 227 § 2, 71 P.S. § 67.1. Any judicial office previously held by a judge or justice who has attained seventy years of age has been considered to be a vacancy to be filled pursuant to this gubernatorial appointment power.

18. Defendant Thornburgh issues a commission to each person elected as a judge or justice. Act of June 3, 1937, P.L. 1333, art. XIV, § 1415, as amended Act of May 18, 1945, P.L. 694, No. 298, § 1, 25 P.S. § 3165. Defendant Thornburgh issues commissions to persons elected to judicial offices made vacant by a judge or justice who has attained seventy years of age.

19. Defendant Allen is responsible for sending to the county board of elections of each county in Pennsylvania a written notice designating all the offices, including judicial offices, for which candidates are to be nominated. Act of June 3, 1937, P.L. 1333, art. IX, § 905, as amended Act of August 13, 1963, P.L. 707, § 10, 25 P.S. § 2865. Defendant Allen designates to be filled by election, any vacancy in a judicial office caused by a judge or justice who attains seventy years of age.

20. Defendant Allen is responsible for certifying to county boards of elections the laws of candidates for judicial office. Act of June 3, 1937, P.L. 1333, art. II, § 201, 25 P.S. § 2621. Defendant Allen certifies, as a judicial vacancy, the office of any judge or justice who has attained seventy years of age. Defendant Allen will not certify, for inclusion on the ballot of a retention election, any judge or justice who has attained seventy years of age.

21. Defendant Casey is responsible for the payment of all salaries established by law, including that of any judge or justice. Act of March 30, 1811, P.L. 145, 5 Sm.L. 228, § 8, as amended, Act of July 18, 1974, P.L. 472, No. 168, § 1, 72 P.S. § 4521. Defendant Casey will not continue to pay a salary to any judge or justice who attains seventy years of age. Defendant Casey will, however, commence to dispense to any judge or justice who attains seventy years of age any funds to which such judge or justice may be entitled under the State Employees' Retirement Code, 71 Pa.C.S. § 1501 et seq.

22. Defendant Barbieri is responsible for the maintenance of central records relating to the qualifications, employment status, basis of compensation and other personnel information of all personnel of the Pennsylvania judicial system compensated in whole or in part through funds appropriated to the judicial system pursuant to Rule 504(10) of the Pennsylvania Rules of Judicial Administration. Defendant Barbieri authorizes the Treasurer of the Commonwealth to discontinue the salary of any judge or justice who attains seventy years of age, and thereby causes such judge or justice to be removed from the State Judicial payroll. Defendant Barbieri also certifies to the

Governor and to the Secretary of the Commonwealth a vacancy in any judicial office held by a judge or justice who attains seventy years of age.

23. No non-judicial elected official in Pennsylvania is subject to a mandatory retirement age.

24. Section 8 of the Schedule to Article 5 of the Pennsylvania Constitution (Adopted in 1968 to be effective January 1, 1969) the so-called "grandfather clause," provides that "[n]otwithstanding any provision in the article, a present justice, judge or justice of the peace may complete his term of office." The term "present" refers to the effective date of the provision.

25. Plaintiffs herein cannot avail themselves of the so-called "grandfather clause" to avoid retirement at age 70. Only those justices and judges elected prior to January 1, 1969, namely Chief Justice Eagen, Justice O'Brien and Justice Roberts of the Pennsylvania Supreme Court are subject to the so-called "grandfather clause."

26. Article V, Section 18 of the Pennsylvania Constitution (Adopted in 1968 to be effective January 1, 1969) provides for the creation of a Judicial Inquiry and Review Board. The Board considers grounds for suspension, removal, discipline, or compulsory retirement of a justice or judge for prohibited activities, including a violation of any legal or judicial canon, misconduct in office, neglect of duty, failure to perform his duties, conduct which prejudices the proper administration of justice or brings the judicial office into disrepute, or for disability seriously interfering with the performance of his duties. Pursuant to the above provision, the Pennsylvania Supreme Court promulgated Rules of Procedure Governing the Judicial Inquiry and Review Board, a copy of which is marked Exhibit P–8.

27. Pursuant to the present provisions of Article V, Section 16(b) of the Pennsylvania Constitution each of the plaintiffs would be retired from office on the following dates notwithstanding the fact that none of them will have completed the term of office for which he was elected:

| | | |
|---|---|---|
| Malmed | — | January 2, 1982 |
| Kubacki | — | August 25, 1985 |
| Lagakos | — | October 16, 1982 |
| Murphy | — | October 21, 1980 |
| Stern | — | January 26, 1980 |

28. If each of the plaintiffs is forced to retire upon the attainment of his seventieth birthday, defendant Thornburgh will declare a vacancy in that judge's office, will consider himself free to appoint a new judge to fill that vacancy, and will issue a commission to any person appointed and confirmed to fill that vacancy.

29. If each of the plaintiffs is forced to retire upon the attainment of his seventieth birthday, defendant Allen will notify the Board of Elections of Philadelphia County that the judge's office is vacant and is one for which candidates are to be nominated, and further defendant Allen will not certify for inclusion on the ballot for retention any of the plaintiffs after he has reached his seventieth birthday.

30. If each of the plaintiffs is forced to retire upon the attainment of his seventieth birthday, defendant Casey will not pay him a salary for full-time judicial service.

31. If each of the plaintiffs is forced to retire upon the attainment of his seventieth birthday, defendant Barbieri will cause said judge to be removed from the State Judicial payroll and will certify to the Governor and Secretary of the Commonwealth a vacancy in that judge's office.

32. Each of the plaintiffs is presently physically and mentally capable of performing and fulfilling his judicial duties.

33. Chief Justice Eagen, age 71, Justice O'Brien, age 75, and Justice Roberts, age 72, are all presently in active service on the Supreme Court of Pennsylvania under the grandfather clause and will not be required to retire until the end of their respective terms. The term of office and active service of Chief Justice Eagen expires on the first Monday in January 1981, for Justice O'Brien in 1983 and Justice Roberts in 1984.

34. There are presently 54 senior judges in the Commonwealth of Pennsylvania, of whom 47 are 70 years of age or more.

There are approximately 300 active judges in the Courts of Common Pleas, Commonwealth Court, Superior Court, and Supreme Court. See 1978 Report, Administrative Office of Pennsylvania Courts.

35. Between January 1, 1969, and the present, every judge who has reached the age of 70 while in office, and requested assignment to duties as a senior judge was accepted as a senior judge and served as a senior judge.

36. From 1968 to the present there has been and continues to be a shortage of judicial manpower in Pennsylvania.

37. Senior judges like active judges can be assigned duties in any county in the Commonwealth.

38. Judge Lipez of the Court of Common Pleas of Lycoming County who has been retired because of reaching the age of 70 has been assigned duties as a Senior Judge on the Superior Court of Pennsylvania, and the following Superior Court Judges who have been retired because of reaching the age of 70 have been assigned duties as senior judges on the Superior Court:

J. Sydney Hoffman, age 70
Harry M. Montgomery, age 77
Robert VanDerVoort, age 70
G. Harold Watkins, age 76.

39. The method used for determining whether a judge who so desires may serve as a senior judge is set forth in Pennsylvania Rule of Judicial Administration 701.

40. Prior to the 1968 amendment to the Judiciary Article (Article V) of the Pennsylvania Constitution there was no compulsory retirement of judges in Pennsylvania.

41. Prior to 1965 there was no provision in the law of Pennsylvania for the service of former judges after their retirement.

42. On November 2, 1965, the Constitution of 1874 was amended by adding Section 18 to Article V thereof which provided:

The Chief Justice of the Supreme Court may designate and assign former judges, learned in the law, who are willing so to do, who have served at least one term and who have not been defeated for re-election, to the office of judge of any court of record, to temporarily sit in the courts of any judicial district for the disposal of business under such circumstances and subject to such qualifications and conditions as the General Assembly may prescribe.

43. Pursuant to the provisions of Article V, Section 18 of the Pennsylvania Constitution as amended November 2, 1965, the Pennsylvania legislature passed the Act of August 31, 1966, P.L. 47 §§ 1 *et seq.*, 17 P.S. §§ 790.101 *et seq.* (Supp.) which provides that any former judge who has served at least one term and who has not been defeated for reelection may be assigned by the Chief Justice of the Supreme Court to sit temporarily as a judge in any judicial district. The president judge of any court of record may request the services of one or more former judges when he deems it "necessary for the purpose of expediting the business of the said court." 17 P.S. § 790.-104.

44. The Supreme Court of Pennsylvania adopted Supreme Court Rule 79, effective October 10, 1966, which provides as follows:

Any former Judge learned in the law who has served at least one term and has not been defeated for reelection and who shall file with the Prothonotary of the Supreme Court, at any convenient time after the effective date of this Rule, a statement of the ensuing weeks or months during which he is willing to be assigned to sit in the Courts of any judicial district for the disposal of its business, and certifies that he is not engaged in the practice of law or in any activity incompatible with Judicial office and does not intend to engage in the practice of law in the future, may be designated and assigned by the Chief Justice of the Supreme Court to the office of Judge of any court of record to sit temporarily and as directed by the Chief Justice in the courts of any such judicial districts for the disposal of such business as may arise during the period of assignment, provided that no former Judge shall be assigned to any

district while any Judge thereof is assigned to and presiding in another district under any of the provisions of any Act of Assembly.

45. Article V, Section 16(c) of the Pennsylvania Constitution (Adopted in 1968 to be effective January 1, 1969) provides:

(c) A former or retired justice or judge may, with his consent, be assigned by the Supreme Court on temporary judicial service as may be prescribed by rule of the Supreme Court.

46. By Order of the Supreme Court dated March 15, 1972, Supreme Court Rule 79 was renumbered as Pennsylvania Rule of Judicial Administration 701.

47. The current annual salary for judges of the Courts of Common Pleas on active service is $45,000 per year.

48. Included in the benefits which judges of the courts of Common Pleas on active service enjoy are:

(a) Sick leave with pay

(b) Paid Vacation

(c) Pay regardless of whether the judge is in chambers or in court.

49. The current compensation for senior judges assigned to duties by the Court Administrator is $125. per court day for days actually worked. Therefore, no compensation is provided for days spent working in chambers.

50. Senior judges called back to perform duties receive no paid sick days or paid vacation.

51. Per diem payments to senior judges are not considered compensation under the State Employees retirement of 1974, and therefore, do not increase the pension of such judges.

52. The availability of funds to pay senior judges called back to perform duties is dependent on the appropriation of funds for that purpose by the legislature.

53. During the past several years the legislative appropriation for the payment of the per diem salary of senior judges called back for temporary service has not been large enough to pay the per diem salary for all the days of service of qualified and available senior judges whose services were needed by the courts of Common Pleas and as a result many senior judges worked part of the time for no compensation at all.

54. During the course of their active service judges in Pennsylvania are required to make contributions to the pension fund pursuant to 71 Pa.C.S.A. §§ 5101 *et seq.* and an amount of money is deducted from each judge's monthly salary for that purpose.

55. During the course of their active service as judges deductions have been made from the monthly salary of the plaintiffs for contribution to the pension fund.

56. Contributions made by the judges, including the plaintiffs, appreciate at the rate of four percent interest per year compounded annually.

57. The money which is deducted from a judge's salary for contribution to the pension fund is considered income to that judge for federal income tax purposes and, therefore, he pays tax on that money in the year he earns it.

58. At the time that each of the plaintiffs reaches his seventieth birthday he will have total accumulated deductions from his salary in the pension fund as follows:

| | |
|---|---|
| Judge Malmed | $ 57,054 |
| Judge Stern | 85,967 |
| Judge Kubacki | 106,292 |
| Judge Lagakos | 122,681 |

59. At the time that each of plaintiffs reaches his seventieth birthday he will have acquired a vested interest in pension funds contributed by the Commonwealth, the present value of which will be as follows as of the seventieth birthday of each plaintiff (calculated as of April 1979):

| | |
|---|---|
| Judge Malmed | $ 96,568 |
| Judge Stern | 146,667 |
| Judge Kubacki | 127,894 |
| Judge Lagakos | 152,210 |

60. The amount of money contributed to the pension fund by the Commonwealth for the benefit of any judge increases with each additional year of credited service attributed to that judge.

61. Upon retirement each judge, including the plaintiffs, will be given various options with regard to receiving the pension funds to which he is entitled. These options include the right to withdraw in a lump sum an amount of money not to exceed his total accumulated personal contribution to the pension fund and to receive annuities in varying amounts for his life and/or the life of a designated beneficiary at his death. These options are explained in the documents marked as P–9, P–10, P–11, and P–12, the only variable for different judges being the amount of money which depends on the individual judge's years of credited service, the amount of his salary during his active service, his life expectancy at retirement, and the life expectancy of his beneficiary.

62. The monthly payment which a judge and/or his beneficiary will receive under any given annuity will be larger, the shorter the life expectancy of the judge and/or his beneficiary at the time of the judge's retirement.

63. The larger the amount that the judge receives from his pension during his lifetime, the less that his beneficiary will receive either in a lump sum or monthly payments after the judge's death.

64. Exhibit P–9 sets forth the pension benefits to which Judge Malmed will be entitled upon reaching age 70 under various options calculated as of April 1979.

65. Exhibit P–10 sets forth the pension benefits to which Judge Stern will be entitled upon reaching age 70 under various options calculated as of April 1979.

66. Exhibit P–11 sets forth the pension benefits to which Judge Kubacki will be entitled upon reaching age 70 under various options calculated as of April 1979.

67. Exhibit P–12 sets forth the pension benefits to which Judge Lagakos will be entitled upon reaching age 70 under various options calculated as of April 1979.

68. Judges under 70 on active service acquire additional retirement benefits with added service. On the other hand, judges over 70 who return to temporary judicial service not only do not acquire additional retirement benefits during the period of their post retirement service, pension payments received by them during such service actually diminish the pension estate available for beneficiaries after the judge's death.

Stipulation ¶¶ 52, 56–71.

69. The compensation of a judge over 70 who returns to temporary judicial service is limited by 42 Pa.C.S.A. § 3154(c) to an amount which together with the payments he receives from the pension fund will not exceed $45,000.

70. The mere fact that a judge reaches the chronological age of 70 does not affect his ability to perform his judicial duties and the vast majority of judges reaching the age of 70 are capable of continuing to perform those duties. See testimony of Doctors Obrist and Gorson, and Exhibits P–1, P–2, P–3, and P–4.

71. Persons, such as judges, who achieve success in learned professions are likely to retain their mental abilities for considerably longer periods of time than the population at large.

72. Individual determinations of the ability of individual judges age 70 and over could effectively filter out those judges who because of physical or mental disabilities are unable properly to perform their judicial functions.

73. The service of senior judges called back to perform duties has been essential to the administration of the court system in Pennsylvania in general and the court system in Philadelphia in particular.

74. Judges under 70 on active service receive an annual salary of $48,000, which when weekend, holidays and vacations are considered amounts to $200 per work day. On the other hand, judges over 70 who return to temporary judicial service receive only $125 per work day, and if such judges worked five days a week for 52 weeks, they would at the most earn $32,500 per year.

Stipulation ¶¶ 48, 50. Exhibit P–6 at pp. 23–25.

75. Judges under 70 on active service receive their judicial salary regardless of whether they are performing duties in court or in chambers and regardless of whether they are attending a judicial conference. On the other hand, judges over 70 who return to temporary judicial service are paid only for days in court and, therefore, are not paid for chambers time or time spent at judicial conferences.

Stipulation ¶¶ 49(c), 50. Exhibit P–6 at pp. ——. Testimony of President Judge Bradley.

76. Judges under 70 on active service receive their judicial salary for unlimited periods of time while they are unable to work because of illness so long as it appears that they will at some future time be able to return to their judicial duties. On the other hand, judges over 70 who return to temporary judicial service do not receive even a single paid sick day.

Stipulation ¶¶ 49(a), 51. Testimony of President Judge Bradley.

77. Judges under 70 on active service receive paid vacation time. On the other hand, judges over 70 who return to temporary judicial service receive no paid vacation time.

Stipulation ¶¶ 49(b), 51. Testimony of President Judge Bradley.

## DISCUSSION

Plaintiffs' attack on the state's mandatory retirement system is double-barrelled. They argue that the challenged provision violates both the due process and the equal protection clauses of the Fourteenth Amendment. I am in complete agreement with their position.

## I. DUE PROCESS

Plaintiffs contend that the mandatory retirement provision of the Pennsylvania Constitution violates their right to due process because it creates an "irrebuttable presumption" of incompetence to perform judicial duties. No challenge is raised to the legitimacy of the state's interest in insuring a competent judiciary. On the contrary, plaintiffs maintain that rather than being automatically retired at 70, judges[2] should be given individual opportunities to demonstrate their continued competence and ability.

In support of their position, plaintiffs rely heavily on the Supreme Court's holding in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). There, the Court considered a constitutional challenge to school board rules requiring pregnant teachers to take unpaid leaves of absence several months before they were expected to give birth. The defendants offered two justifications for such a rule. First, the maternity leave requirement fostered "continuity of classroom instruction" since it provided a firm date when the teacher would leave her employment, thereby making it easier to hire a substitute. The Court summarily rejected this argument, since any firm date chosen by the teacher herself would serve the same purpose, provided that the school board was given advance notice. 414 U.S. at 641–42, 94 S.Ct. at 797; see *Green v. Waterford Board of Education,* 473 F.2d 629 (2d Cir. 1973).

Secondly, the defendants contended that mandatory maternity leaves served "the necessity of keeping physically unfit teachers out of the classroom," thereby insuring the safety of both the teacher and the students. The Supreme Court acknowledged that schoolroom safety was a perfectly legitimate state purpose, and there was no doubt that the mandatory leave rules served that purpose. 414 U.S. at 643–44, 94 S.Ct. at 798. This, however, was no answer to the due process challenge, since the rules in question "amount to a conclusive presumption that every pregnant teacher who reaches the fifth or sixth month of pregnancy is physically incapable of continuing." 414 U.S. at 644, 94 S.Ct. at 798. Notably lacking was any "individualized de-

---

2. The mandatory retirement rule applies to "[j]ustices, judges, and justices of the peace." My holding in this opinion, however, is limited to judges of the Court of Common Pleas, since the evidence before me concerned only that court.

termination" of a particular teacher's ability to continue in her job. Rather, "the rules contain an irrebuttable presumption of physical incompetency," and the presumption applied even to persons who remained fully able to teach. 414 U.S. at 644, 94 S.Ct. at 798.

The Court went on to observe that while the medical evidence in the record conflicted on many points, it overwhelmingly supported the conclusion that the time at which any pregnant woman becomes unable to work "is very much an individual matter." 414 U.S. at 645, 94 S.Ct. at 799 (footnote omitted). Indeed, while some pregnant women would be unable to work beyond the arbitrary cutoff dates established by the defendants, there plainly were many others who could continue for longer periods. Thus, said the Court, the presumption contained in the rules "is 'neither necessarily [nor] universally true,' and is violative of the Due Process Clause." 414 U.S. at 646, 94 S.Ct. at 799.[3]

In so holding, the Court recalled its earlier decisions in *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The *Vlandis* decision held unconstitutional as violative of due process a state law which created an irrebuttable presumption of nonresidence for the purpose of benefitting from reduced tuition rates at a state university. The Court declared that such a presumption "is forbidden by the Due Process Clause" when it is not necessarily true in every case, "and when the State has reasonable alternative means of making the crucial determination." 412 U.S. at 452, 93 S.Ct. at 2236. In similar fashion, the irrebuttable presumption that unwed fathers are not competent parents fell under a due process challenge in *Stanley*. There, the Court conceded *arguendo* that the presumption in question could be accurately applied to *most* unmarried fathers. 405 U.S. at 654, 92 S.Ct. at

1214. Nevertheless, since it was not true that *all* the persons affected were in fact incompetent, "the Due Process Clause required a more individualized determination" *LaFleur*, supra, 414 U.S. at 645, 94 S.Ct. at 799.

The *LaFleur—Vlandis—Stanley* line of authority controls the present case. Here, the state has created a presumption that all judges become incompetent to perform their judicial duties when they reach 70 years of age, and it therefore requires them to retire from the bench at that point in their lives. The rule applies regardless of the fact that the particular judge involved may be fully capable of continuing to carry out the duties of his or her judicial office.

■ The principal justification advanced by the Commonwealth for this rule is "the removal of unfit judges from the bench by means of mandatory retirement at age seventy." Brief for Defendants, at 4. This is an undeniably legitimate state purpose, and plaintiffs make no argument to the contrary. It could even be conceded, for the moment, that the rule furthers this purpose if we assume *arguendo* that at least *some* judges are no longer able to perform their duties when they reach age 70. The question before me now, however, "is whether the [rule sweeps] too broadly" in serving its admittedly legitimate purpose. *LaFleur*, supra, 414 U.S. at 644, 94 S.Ct. at 798. I hold that it does.

It is clear that the presumption we are concerned with is true in neither all nor even most cases. The evidence showed, not surprisingly, that the age at which a person's intellectual abilities and physical stamina are lost or diminished is a highly individual matter. Indeed, for the purpose of determining a point of reduced mental capacity, health is a far more critical factor than age. N.T. 44. This, of course, will vary dramatically from one person to the next. It should be noted that the variable

---

**3.** It is interesting to note that Justice Rehnquist's dissenting opinion in *LaFleur* anticipated the very case that now stands before me. The dissent, joined in by Chief Justice Burger, speaks of "the jeopardy in which the Court's opinion places longstanding statutes providing for mandatory retirement of government employees." *LaFleur*, supra, 414 U.S. at 659, 94 S.Ct. at 805 (Rehnquist, J., dissenting).

which the Supreme Court found fatal in *LaFleur*, supra, was only a matter of weeks, or at most, months. Here, by contrast, the variation could range over dozens or even scores of years.

Moreover, it is clear that the Commonwealth itself does not believe in the validity of its own presumption. As indicated in my findings of fact, while judges in Pennsylvania are forced to retire at 70, they are not forced to stop being judges. Rather, the state permits retired judges to serve as "senior judges" if they so desire and if they are considered competent. Senior judges might have little significance to this case if their services were merely incidental to the operation of the state's judicial system. Nothing, however, could be further from the truth. The fact is that the Commonwealth relies on the work of senior judges to such an extent that they have become vital to the continued functioning of the Pennsylvania court system.

Presently, there are 54 former or retired judges rendering service as senior judges in Pennsylvania. Of these, 47 are over 70 years of age. At the same time, there are approximately 300 active judges serving in the Courts of Common Pleas, Commonwealth Court, Superior Court, and Supreme Court. Thus, senior judges constitute roughly 15 percent of the total judicial work force. It is clear from the record that a shortage of judicial manpower has existed in the Commonwealth for some time. N.T. 91. Although it is still a problem, this shortage has been significantly alleviated by the work of senior judges.

The experience of Philadelphia County is illustrative. At the present time, Philadelphia has 80 active judges and eight senior judges in the Court of Common Pleas. N.T. 88. The senior judges maintain substantially the same level of productivity as active judges. N.T. 97. One senior judge serves as supervising judge of the arbitration pro-

gram in addition to performing all his regular judicial duties on a full-time basis. N.T. 93. Other senior judges work in each of the court's divisions and render services that would otherwise have to be performed by active judges.

It is clear that the work of the senior judges has had a visibly favorable impact on the efficient operation of the Court of Common Pleas. The court has experienced a significant reduction in its backlog of cases which would not have been possible without the senior judges. N.T. 94. Moreover, because of the availability of senior judges, it is no longer necessary for the court in Philadelphia to request assistance from active judges in other districts. This had to be done regularly before the advent of the senior judge system. N.T. 108.

It is fair to conclude, therefore, that senior judges make an important contribution to the functioning of the Pennsylvania judicial system,[4] and it will be remembered that the vast majority of these judges are over 70 years old. I am also mindful of the telling fact that since the inception of the senior judge system, the request of *every* former and retired judge for assignment to senior judge duties has been granted.

The above discussion reveals clearly that the Commonwealth itself places little credence in the validity of the presumption created by its mandatory retirement rule. The fact is that there are great numbers of judges who are perfectly capable of continuing in their judicial office well beyond the age of 70 years.

■ It may be that *some* judges are incapable of effectively performing their duties when they reach 70, and some may even lose their abilities substantially *before* that time. Nevertheless, it is wholly unnecessary to trample on the rights of all who reach a given age merely in order to weed out the few who are no longer fit. Such an

4. The evidence in the record concerning the duties and performance of senior judges dealt largely with Philadelphia County. The defendants, however, offered no credible evidence to show that the favorable effect of the senior judge system in Philadelphia was significantly different from other counties. On the contrary, from the evidence before me it is fair to conclude that senior judges have come to play an important role in the efficient functioning of the state court system as a whole.

approach violates due process, especially where, as here, "the State has reasonable alternative means of making the crucial determination." *Vlandis v. Kline*, supra, 412 U.S. at 452, 93 S.Ct. at 2236.

Reasonable alternative means exist in this case. Finding of Fact No. 26 refers to the creation of the Judicial Inquiry and Review Board, pursuant to Article V, Section 18 of the Pennsylvania Constitution. This board is empowered to conduct investigations concerning allegations that a judge is guilty of misconduct or neglect of duty, or that he suffers from a disability which impedes the performance of his judicial functions. Such an investigation may be initiated by the Board on its own, or it may be in response to a complaint filed by any person. Exhibit P–8 sets forth the rules which establish a detailed procedure for a formal hearing where it is warranted. Following such a hearing, the Board can make a recommendation that the judge involved be suspended, removed, disciplined, or compelled to retire. Final authority for taking such action rests with the Supreme Court.

It is clear, therefore, that a procedure for monitoring the competence of judges already exists in Pennsylvania. Indeed, it might fairly be argued that the Inquiry and Review Board, without change, is adequate to serve the state interest of keeping unfit judges off the bench. Certainly, modifications are available which could fill any void left by the removal of the mandatory retirement rule. For example, the state could require that all judges' work be reviewed at a certain age, or a review could take place periodically, without regard to age. It is not within my province to delineate the mechanics of such a system. The important point is that reasonable alternative means exist for controlling the quality of the state's judiciary without imposing an arbitrarily chosen age at which all must retire. At the very least, it is no more difficult to measure the competence of a judge than it is to determine whether a pregnant woman can control a classroom, or whether an unmarried man can raise a child. See *LaFleur; Stanley*, supra.

In addition to the need for maintaining judicial competence, the state offers several lesser justifications for the mandatory retirement rule. First, the Commonwealth submits that the present system serves the purpose of "updating the judiciary by infusion of 'new blood' knowledgable in modern trends in the law." The defendants have offered no evidence, however, to show that elderly judges are any less cognizant of modern legal trends than their younger counterparts. In fact, quite the opposite may be true. The record contains numerous references to the benefits which the judicial system derives from the wisdom and experience of former and retired judges who serve as senior judges. See, e. g., Statement of Chief Justice Eagen Relative to Amendment of Pa.R.J.A. 701(a), October 5, 1977; see also Exhibit P–6. Absent persuasive supporting evidence, an intrusion on constitutional rights cannot be justified by the proposition that new blood is better than old blood.

The state further submits that the present system of mandatory retirement provides opportunities for elevation to the bench; avoids the difficulty of determining an individual judge's competence; and provides certain notice of upcoming judicial vacancies. While each of these purposes may be arguably legitimate, they are all matters of mere administrative convenience. Each can be amply served by other measures which do not infringe on constitutionally protected rights. "[A]dministrative convenience alone is insufficient to make valid what otherwise is a violation of due process of law." *LaFleur*, supra, 414 U.S. at 647, 94 S.Ct. at 799.

I am persuaded, therefore, that the irrebuttable presumption created by Pennsylvania's mandatory retirement rule violates the due process clause because it is untrue in most, if not all, cases, and because reasonable alternative means exist by which the state can accomplish the rule's intended purposes.

In addition to *LaFleur, Vlandis,* and *Stanley,* supra, there are other cases which support this conclusion. Most significant

among these is *Gurmankin v. Costanzo*, 556 F.2d 184 (3d Cir. 1977). The *Gurmankin* plaintiff was a blind woman who was denied the right to take a teacher's examination. Following *LaFleur*, the Third Circuit found that due process had been violated by the irrebuttable presumption that blind persons are incompetent to teach sighted students. Here also, the constitutional challenge was not to the requirement that teachers be competent to teach, but only to the denial of an opportunity for plaintiff to demonstrate her competence. 556 F.2d at 187, and n. 5.

Also persuasive is the recent decision of my learned colleague, Judge Cahn, in *Davis v. Bucher*, 451 F.Supp. 791 (E.D.Pa.1978). There, the irrebuttable presumption that persons with a history of narcotics abuse were incompetent to engage in public employment was held violative of the due process clause. Once again, the Constitution was interpreted to require individual determinations of competence. In so holding, Judge Cahn noted that the plaintiffs before him were only *applying* for work, thereby placing them in a somewhat less tenable position than the *LaFleur* plaintiffs, who sought to protect their rights to present employment. Mindful of this distinction, the court refrained from holding that the plaintiffs were entitled to a full hearing on all job qualifications. Nevertheless, "if the City establishes a policy which is as facially arbitrary as the one in the case at bar and seeks to apply it in a conclusive manner, then plaintiffs should, at a minimum, be given an opportunity to demonstrate that the policy is inappropriate in their case." 451 F.Supp. at 800.

Despite the clear teachings of these cases, however, the defendants contend that the analysis expressed at length above is not a proper ground for decision. They argue that however compelling the irrebuttable presumption doctrine may once have been, it is no longer applicable in this, or any other, case.

To follow the course of defendants' reasoning, we must begin with the decision of the Court of Appeals for the Seventh Circuit in *Trafelet v. Thompson*, 594 F.2d 623 (7th Cir. 1979), cert. denied, —— U.S. ——, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979). There, a due process challenge was raised to an Illinois statute requiring retirement of state court judges at age 70, thus presenting a controversy which is materially indistinguishable from the present case. Finding no constitutional violation, the Seventh Circuit rejected a due process argument which was grounded firmly on the irrebuttable presumption doctrine. Clearly, if I chose to follow it, the *Trafelet* opinion would be fatal to the cause of action in the present case. Nevertheless, for several reasons, I find the Seventh Circuit's decision to be unpersuasive.

In rejecting the irrebuttable presumption approach, the *Trafelet* court relied heavily on an earlier decision of the Seventh Circuit, *Miller v. Carter*, 547 F.2d 1314 (7th Cir. 1977), *aff'd by an equally divided court*, 434 U.S. 356, 98 S.Ct. 786, 54 L.Ed.2d 603 (1978), where "we expressed our uncertainty concerning the scope and continuing force of the doctrine of irrebuttable presumptions." *Trafelet*, 594 F.2d at 629. Evidently, this "uncertainty" is based on the failure of the Supreme Court to rely upon or even mention the irrebuttable presumption doctrine in the recent decisions of *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), and *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). These decisions held, respectively, that the equal protection clause was not violated by mandatory retirement rules affecting state police officers and foreign service officials.

■■■■ For reasons explained later in this opinion, I find that *Murgia* and *Vance* are wholly distinguishable from the equal protection claim now before me. As far as due process is concerned, the fact is that these cases simply do not address the issue.[5] The

---

5. Plaintiffs have argued that the Supreme Court *could not* consider the irrebuttable presumption doctrine in *Murgia*, supra, because

the issue was not raised. The question presented on appeal, however, simply asked the Court to decide: "Is Massachusetts statute

irrebuttable presumption analysis is a doctrine of constitutional law developed in a due process context. It has been endorsed and relied upon by the Supreme Court in at least three major decisions within the past seven years. See *LaFleur, Vlandis, Stanley,* supra. It is inconceivable to me that such a doctrine could be somehow negated or overruled by default simply because the Supreme Court has not availed itself of several alleged opportunities to discuss it. From the language and analysis used in the majority opinions, it is clear to me that *Murgia* and *Vance* were decided strictly in an equal protection context.[6] They should not, therefore, be read as impliedly overruling a doctrine developed within the scope of due process.

Apparently, the *Trafelet* court was not concerned with the fact that the constitutional analysis in *Murgia* and *Vance* was limited to equal protection. The court relied here on the Second Circuit's opinion in *Palmer v. Ticcione,* 576 F.2d 459 (2d Cir. 1978), cert. denied, 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979), which suggests the theory that the irrebuttable presumption doctrine, though born in the realm of due process, was later absorbed into equal

protection law, where it died a silent death. Thus, it is said that "where 'the statutory classification is sustainable as rationally based, then it should not fall because it might also be labelled a presumption.' " *Trafelet,* supra, 594 F.2d at 630, quoting *Palmer,* supra, 576 F.2d at 463. In my view, this approach ignores the clear command of *LaFleur, Vlandis,* and *Stanley.* In each of those cases, the statutory classification involved might well have been "sustainable as rationally based." In *LaFleur,* the Supreme Court stated plainly that the "mandatory termination . . . rules surely operate to insulate the classroom from the presence of potentially incapacitated pregnant teachers." 414 U.S. at 644, 94 S.Ct. at 798. Similarly in *Stanley,* the Court was willing to concede *arguendo* that "most unmarried fathers are unsuitable and neglectful parents," thereby providing a clearly rational basis for the rule in question. Nevertheless, where the rules were not universally applicable, and where a reasonable alternative means existed for making the necessary determination, the statutory classification in each of those cases fell, precisely because it could be "labelled a presumption." [7]

The determinative consideration in both *Murgia* and *Vance* was the presence of a rational basis for the challenged rules. This factor, of course, is traditionally associated with equal protection analysis, rather than due process.

mandating retirement of state police officer upon reaching age of 50 constitutional?" 43 U.S.L.W. 3504 (March 18, 1975). It appears therefore that the Court could have inquired into the due process aspects of the case if it so desired. Nevertheless, it is clear that the Court's opinion dealt only with equal protection principles, and I will not read it as extending beyond that realm.

**6.** "This case presents the question whether the provisions . . . that a uniformed state police officer 'shall be retired . . . upon his attaining age fifty,' denies appellee police officer equal protection of the laws in violation of the Fourteenth Amendment." *Murgia,* supra, 427 U.S. at 308, 96 S.Ct. at 2564. "We decide only that the system enacted by the Massachusetts Legislature does not deny appellee equal protection of the laws." Id., at 317, 96 S.Ct. at 2569. "The issue presented is whether Congress violates the equal protection component of the Fifth Amendment's Due Process Clause . . . ." *Vance,* supra, 440 U.S. at 94, 99 S.Ct. at 942; "In an equal protection case of this type . . . ." Id., at 111, 99 S.Ct. at 950.

**7.** My conclusion that the irrebuttable presumption doctrine stands separate and apart from equal protection law is supported by *Gurmankin v. Costanzo,* 556 F.2d 184 (3d Cir. 1977). There, the Court of Appeals affirmed the decision of a district court that the refusal to permit a blind person to sit for a teacher's examination violated due process because it impermissibly created an irrebuttable presumption. In so holding the court stated that because the due process analysis provided an adequate ground for deciding the case, "there is no reason for us to address Ms. Gurmankin's equal protection contentions. For the same reason we need not consider whether these contentions should . . . be rejected on the authority of *Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam)." 556 F.2d at 188. Thus, despite the views of the Second and Seventh Circuits, it is obvious that the Third Circuit recognizes a distinction between irrebuttable

For these reasons, I reject the defendants' argument that the irrebuttable presumption doctrine is no longer viable. I think it highly improper to hold that a well-established doctrine of due process law has been overruled simply because the Supreme Court failed to mention it in opinions which speak only to the principles of equal protection.[8] Rather, I conclude that absent a clear expression to the contrary, the *LaFleur, Vlandis,* and *Stanley* opinions are still controlling. Therefore, I must apply the irrebuttable presumption doctrine when it is urged upon me in an appropriate case. The doctrine's appropriateness in this case is abundantly clear.

## II. EQUAL PROTECTION

In Part I of this opinion, I have held that the Pennsylvania rule mandating the retirement of judges at age 70 is unconstitutional because it violates the plaintiffs' right to due process of law. This holding is a sufficient ground, by itself, upon which to decide this case and enjoin the enforcement of Article V, Section 16(b). See *Gurmankin v. Costanzo,* supra, 556 F.2d at 188. Nevertheless, the parties have vigorously contested the equal protection aspects of the case, and it is appropriate to discuss these issues as well.

At the outset, it is clear that the right allegedly infringed in this case, i. e., the right to public employment, is not a fundamental right. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Similarly, the plaintiffs do not qualify as a suspect class. See *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). "Strict judicial scrutiny" is therefore inappropriate in this case, and the correct test for deciding the equal protection questions before me is the rational basis standard. *Massachusetts Board of Retirement v. Murgia,* supra, 427 U.S. at 312–14, 96 S.Ct. at 2566–67. In applying this test, I am mindful that "[t]his inquiry employs a relatively relaxed standard" and that "[p]erfection in making the necessary classification is neither possible nor necessary." Id. at 314, 96 S.Ct. at 2567. On the contrary, to survive the rational basis challenge, the rule need only be "rationally related to furthering a legitimate state interest." Id., at 312, 96 S.Ct. at 2566.

Defendants argue that the mandatory retirement of judges rule satisfies the above mentioned standard because it is rationally related to the purpose of keeping unfit judges off the bench. This is, of course, a perfectly legitimate state purpose. The question is whether the challenged rule bears a rational relationship to that purpose.

It is clear that the concept of mandatory retirement at a specified age does not, by itself, violate equal protection.

---

presumption analysis and equal protection law. Moreover, it may readily be inferred from *Gurmankin* that the Third Circuit does not read *Murgia,* supra, as weakening the validity of the irrebuttable presumption doctrine.

**8.** Plainly, there is great danger in attaching undue significance to the Supreme Court's silence. In *Bellotti v. Baird,* —— U.S. ——, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), decided only two months ago, the Court held that a state may not require a minor to obtain parental consent before getting an abortion, unless it also provides her with an alternative procedure whereby she may demonstrate her competence to make the necessary decision on her own, or that in any event the abortion is in her best interests. Id., at ——, 99 S.Ct. at 3048. In so holding, the court does not cite or rely upon the irrebuttable presumption doctrine. Nevertheless, the *Bellotti* analysis is fully consistent with the doctrine's principles. Essentially, the statute conclusively presumed that minors are incapable of giving informed consent to an abortion. Noting that this is not always true, the Court required an alternative means whereby an individual minor could demonstrate her competence.

Would it be fair to assume that the Supreme Court has now overruled the irrebuttable presumption doctrine because, in effect, it has applied the doctrine's principles without actually citing the doctrine itself? Such a conclusion would be an absurd elevation of form over substance. Nevertheless, it is no more illogical than the argument, advanced by defendants, that the Supreme Court has overruled an aspect of due process law by confining itself to equal protection principles in a case that might also have been amenable to a due process analysis.

There are many decisions upholding mandatory retirement systems, and defendants rely on these to support their argument. This line of decisions is led by *Massachusetts Board of Retirement v. Murgia*, supra, and *Vance v. Bradley*, supra. In both cases, the Supreme Court upheld the mandatory retirement of certain public employees. Despite defendants' urgings, however, I find that these cases do not control the present controversy.

In *Murgia*, the Court considered an equal protection challenge to a Massachusetts law requiring uniformed state police officers to retire at age 50. The evidence showed that the physical demands of the job were considerable and that the risk of physical failure clearly increased with age. The district court in *Murgia* found that the rule violated equal protection because no basis had been shown for setting the cutoff at age 50. The Supreme Court reversed, since, however arbitrary a particular age might be, it was clear that a relationship had been shown between advancing age and a diminution of the physical abilities required to perform the officer's job. A rule that removed all at a fixed age, therefore, at the very least, had a rational basis. 427 U.S. at 315, 96 S.Ct. at 2568.

A very different set of facts emerges from the evidence in this case. Here, the record contains no proof of a relationship between advancing age and ability to perform the duties of a judge. On the contrary, the evidence before me belies the existence of any such relationship.

We are not concerned in this case with an occupation that requires sustained physical ability or stamina, such as that of a uniformed police officer. Rather, we are dealing with judges, a most unique and select class of individuals. The evidence before me showed that it is a serious mistake to consider the population as a whole when determining an age at which physical and mental abilities begin to deteriorate. On the contrary, the plaintiffs' expert testified, without contradiction, that persons, such as judges, who have advanced education and who have succeeded in reaching the upper levels of their profession are likely to survive and retain their abilities for a substantially longer period of time than the population at large. N.T. 45–46. This, of course, is fully consistent with the fact that 47 persons over age 70 are presently serving as senior judges in Pennsylvania, rendering significant service to the Commonwealth. It will be remembered, too, that, without exception, every judge over 70 who requested assignment was readily accepted by the state.

The point is that this record provides no support at all for a connection between advanced age and inability to perform the duties of a judge, thereby rendering this case wholly distinguishable from *Murgia*.

█ I am aware that it would be erroneous to place an affirmative burden on the defendants to come forward with "empirical proof" of a decline in ability to perform judicial duties with advancing age. *Vance v. Bradley*, supra, 440 U.S. 110, 99 S.Ct. 950. Rather, it is plaintiffs' duty to "convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Id. at 111, 99 S.Ct. at 950. In my view, plaintiffs have met this heavy burden.

My conclusion here is based on more than the evidence that those at the top of their professions do not of necessity lose their abilities as the years pass. More compelling is the state's own conduct, which indicates clearly that the "governmental decisionmaker" did not and does not believe in the existence of any relationship between advanced age and judicial incompetence.

We have already seen that the state has assigned senior judge duties to every judge who has asked for them. Moreover, we have seen that the senior judges carry heavy workloads, and have become essential to the continued health of the Pennsylvania judicial system. What we have not examined until now is the method by which the senior judges are compensated. Findings of Fact 74 to 77 set forth the striking differences between the compensation of senior judges and that of their "active" colleagues.

Active judges receive an annual salary of $48,000. Senior judges are paid on a per diem basis. They receive $125. per day, which would amount at most to $32,500 per year. Active judges are paid regardless of whether they are on the bench, in their chambers, sick at home, or away on vacation. Senior judges, by contrast, are paid only for days worked, which is strictly limited to time spent on the bench. It does *not* include sick days or vacation periods of any kind. More surprisingly, it also does not include time spent in chambers writing opinions, conducting conferences, or tending to correspondence. While any trial judge knows that these are all necessary adjuncts of conducting trials, they are, nevertheless, not compensable labor for senior judges. Perhaps most remarkable of all is the fact that some senior judges actually render service without *any* compensation because the legislature limits the amount which can be spent for senior judge salaries each year. When this money is exhausted, senior judges work without pay.

While considering this system of compensation, it is to be kept in mind that the state has not as yet turned down an application for senior judge duties, and relies on senior judges as an essential part of its court system. It becomes readily apparent that this system is not in any way related to the removal of unfit judges from the bench. The fact is that the present system does not mandate retirement from the *bench* at all. Rather, it simply mandates retirement from full salary. Removal from the bench has been for all practical purposes, a voluntary matter.

Neither *Murgia* nor *Vance* involved situations where employees were forced to retire, allegedly because they were too old to do their jobs, only to be allowed back into doing precisely what they had done before, albeit for a considerably reduced salary. In both of those cases, there was a clear basis for believing that employees would lose their ability to perform their jobs effectively as they reached advanced ages. Here, by contrast, the state's own conduct shows not only that no such basis exists, but also that the state never truly believed in its existence. The state encourages judges to work past 70, has never turned down a request for post-70 judicial duties, and even relies on the work of judges over 70 to keep its court system operating effectively. Nevertheless, it chooses to pay these judges at a significantly reduced rate, for no apparent reason other than age. In short, the mandatory retirement system is merely a thinly veiled scheme for acquiring cheap judicial labor. In practical application, the system bears no rational relationship to the state's purpose of removing unfit judges. I conclude, therefore, that this system violates plaintiffs' right to equal protection of the laws.

## III. CONCLUSION

█ For the reasons expressed at length above, I hold that the first sentence of Article V, Section 16(b) of the Pennsylvania Constitution insofar as it deals with Common Pleas judges is in conflict with the Constitution of the United States.[9] The enforcement of this provision as well as all of its enabling statutes, must be permanently enjoined.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of the present action. 28 U.S.C. §§ 1331, 1343(3) and (4). This is an appropriate action for declaratory relief. 28 U.S.C. §§ 2201–02.

2. The first sentence of Article V, Section 16(b) of the Pennsylvania Constitution violates the plaintiffs' right to due process of law under the Constitution of the United States because it creates an impermissible irrebuttable presumption.

3. This provision also violates the plaintiffs' right to equal protection of the laws

---

9. It is of no consequence that Article V, Section 16(b) is a provision of the state constitution rather than being a state statute. Even state constitutions must yield when they are in conflict with the Constitution of the United States. See *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), reh. denied, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1965).

under the Constitution of the United States because it is not rationally related to any legitimate state purpose.

4. Defendants must therefore be enjoined from enforcing the first sentence of Article V, Section 16(b) of the Pennsylvania Constitution as to any judge of the Court of Common Pleas.

### ORDER

AND NOW, this 21st day of September, 1979, for the reasons expressed in the foregoing adjudication, the defendants are hereby enjoined from enforcing the first sentence of Article V, Section 16(b) of the Pennsylvania Constitution and all of its enabling statutes as to any judge of the Court of Common Pleas.