621 F.2d 565
 22 Fair Empl.Prac.Cas. 1387,
23 Empl. Prac. Dec. P 31,030
MALMED, Edwin S., Kubacki, Stanley L., Lagakos, Gregory G.,
Murphy, Joseph T., Stern, James L.
v.
THORNBURGH, Richard L., Individually and as Governor of
Pennsylvania, Allen, Ethel D., Individually and as Secretary
of the Commonwealth of Pennsylvania, Casey, Robert E.,
Individually and as Treasurer of the Commonwealth of
Pennsylvania, and Barbieri, Alexander F., Individually and
as Pennsylvania State Court Administrator, Appellants.
 No. 79-2467.
 United States Court of Appeals,
Third Circuit.
 Argued April 21, 1980.
Decided May 13, 1980.
 
 Joseph Kenneth Hegedus, Deputy Atty. Gen., Allen C. Warshaw, Deputy Atty. Gen., Chief, Civ. Litigation, Edward G. Biester, Jr., Atty. Gen., Dept. of Justice, Commonwealth of Pennsylvania, Harrisburg, Pa., for appellants Thornburgh, Allen, and Casey.
 Kathleen M. Quinn, Staff Atty., Administrative Office of Pennsylvania Courts, Philadelphia, Pa., for appellant Barbieri.
 Stephen M. Feldman, Feldman & Feldman, Philadelphia, Pa., for appellees.
 Before ALDISERT, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal by four Pennsylvania officials requires us to decide if Article V, § 16(b) of the Pennsylvania Constitution, which requires retirement of state judges at age seventy, violates the equal protection and due process clauses of the fourteenth amendment. The district court held that it does and enjoined the appellants from enforcing the provision and its enabling statutes. Because we conclude that Article V, § 16(b) does not violate the fourteenth amendment, we reverse.
 
 
 2
 Five judges of the Court of Common Pleas of Philadelphia County, each of whom is nearing his seventieth birthday, brought this action for declaratory and equitable relief against the Governor, the Secretary of the Commonwealth, the Treasurer, and the Court Administrator of Pennsylvania. The action was tried without a jury on April 17, 18, and 20, 1979. On September 21, 1979, the court handed down its opinion and order, Malmed v. Thornburgh, 478 F.Supp. 998 (E.D.Pa.1979), containing extensive findings of fact. It held that the mandatory retirement provision of Article V, § 16(b) conflicts with both the due process and equal protection clauses of the fourteenth amendment of the United States Constitution, declaring the provision null and void, and enjoining the enforcement of the provision and its enabling statutes "as to any judge of the Court of Common Pleas." 478 F.Supp. at 1016. Governor Thornburgh and the other named defendants have appealed.
 
 I.
 
 3
 A special constitutional convention convened in 1967 and made recommendations for revising the Pennsylvania Constitution in four discrete fields: legislative apportionment; judicial administration, organization, selection, and tenure; local government; and taxation and state finances. A new Judiciary Article was adopted on April 23, 1968, including Article V, § 16(b), which provides in relevant part: "Justices, judges and justices of the peace shall be retired upon attaining the age of seventy years." This article was the product of extensive deliberation by the Judiciary Subcommittee of the Preparatory Committee for the Pennsylvania Constitutional Convention, under the direction of Dean Burton R. Laub. The subcommittee identified as a matter of concern "the problem of retiring judges who are mentally or physically unable to perform their duties either by reason of old age or by reason of some mental or physical ailment."[1] The subcommittee described this problem as
 
 
 4
 a sensitive and delicate matter. Practically all lawyers and judges are familiar with the problem, but prefer to keep it in the legal family. Too often the disabled judges choose to remain on the bench despite their failing powers. Why do aged and disabled judges refuse to retire? There probably are many reasons, some personal and others objective. Some prefer the active life of a judge to the withdrawal of retirement. Others are not financially independent, and may find retirement and disability pensions inadequate.[2]
 
 
 5
 In Reference Manual No. 1, distributed to the delegates by the Preparatory Committee, chaired by then Lieutenant Governor, now United States District Judge, Raymond J. Broderick, the committee stated: "Mandatory retirement does substantially increase judicial manpower when a plan for part-time post-retirement service exists. The combined old experience and new energetic manpower helps alleviate case back-log."[3] Noting that "(a)bout one-half of the states require judges to retire at a fixed age, with seventy years being the most common,"[4] the Judiciary Subcommittee summarized the arguments favoring a mandatory retirement provision. In Reference Manual No. 5, it noted that a mandatory retirement policy
 
 
 6
 substantially increases judicial manpower when a plan for part-time post-retirement service exists. By continually bringing in younger judges while retaining the part-time services of willing and able retired judges, a system of mandatory retirement plus post-retirement service helps solve the pressing problem of court congestion and delay. As mentioned previously, Pennsylvania already has provided for voluntary post-retirement service.
 
 
 7
 eliminates unpleasantness of removing aged and disabled judges on an individual selective basis. Mandatory retirement is more impersonal than individual removal; everyone is treated alike. The difficulty and unpleasantness of determining which judges are senile and which are not is largely avoided.
 
 
 8
 prevent(s) harm by few senile judges (which) more than offsets loss of judges who retain full powers past normal age. Besides, the services of able retired judges may be secured by a provision for post-retirement service.
 
 
 9
 corresponds with current trend towards mandatory retirement in other public and private employments. There appears to be no good reason why judges should be treated differently from other public officials, teachers, executives, and other professional people who are subject to compulsory retirement.[5]
 
 
 10
 The subcommittee reported that the American Bar Association had proposed that judges be required to retire at an age fixed by statute, but not less than age sixty-five.[6] Moreover, the Pennsylvania Bar Association had advocated mandatory retirement for Pennsylvania trial judges at an age not younger than seventy.[7] The National Municipal League had made a similar recommendation in its model state constitution.[8]
 
 
 11
 The parties have stipulated that the Judiciary Subcommittee of the Preparatory Committee drafted what subsequently became Article V of the Pennsylvania Constitution when ratified by popular vote on April 23, 1968.[9] A fair reading of Reference Manual No. 5 and a thorough examination of the Journal of the Constitutional Convention discloses no basis for the district court's major premise that the predominant purpose of § 16(b) is "a presumption that all judges become incompetent to perform their judicial duties when they reach 70 years of age . . . ." 478 F.Supp. at 1008.[10] Therefore, the reasons stated to the delegates by the convention's Preparatory Committee are central to a proper analysis of § 16(b) because they constitute the only record of the legislative purpose underlying the provision.
 
 
 12
 In reviewing a state statute or constitutional provision under the due process or equal protection clause, a court must determine if the provision rationally furthers any legitimate state objective. "For these purposes, it is, of course, constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . ." Flemming v. Nestor, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960). The court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack. See Weinberger v. Salfi, 422 U.S. 749, 780, 95 S.Ct. 2457, 2474, 45 L.Ed.2d 522 (1975); Williamson v. Lee Optical Inc., 348 U.S. 483, 487-90, 75 S.Ct. 461, 464-65, 99 L.Ed. 563 (1955); Trafelet v. Thompson, 594 F.2d 623, 626 (7th Cir.), cert. denied, 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979). The legitimate purpose justifying the provision need not be the primary purpose of the provision. McGinnis v. Royster, 410 U.S. 263, 276, 93 S.Ct. 1055, 1062, 35 L.Ed.2d 282 (1973). Although our examination would not necessarily be limited to the purposes explicitly stated in the documents of the Judiciary Subcommittee, we conclude that the objectives therein are sufficient to uphold § 16(b) under both the equal protection and due process clauses.
 
 II.
 
 13
 The district court concluded that Article V, § 16(b) violates the equal protection clause of the fourteenth amendment to the United States Constitution because it deprives appellees of their employment solely because they are seventy years old, thereby discriminating against them on the basis of age. By treating appellees differently than younger judges, the court held that the provision implicates the equal protection clause. Absent a rational relationship to a legitimate state objective the provision offends the equal protection clause. Before examining the court's equal protection analysis, we must consider the relevant teachings of the Supreme Court.
 
 A.
 
 14
 Of the many equal protection decisions announced by the Supreme Court in recent years, two are particularly applicable. Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam). In Murgia, the Court rejected a challenge to a Massachusetts statutemandating retirement of uniformed state patrolmen at age fifty. The district court had held that the compulsory retirement requirement was not rationally related to the legislative objective of assuring physical ability of active officers. In reversing, the Court agreed with the district court that the rational basis standard of review was applicable, noting that the challenged statute affected neither a fundamental right nor a suspect class. 427 U.S. at 312-14, 96 S.Ct. at 2566-67. It disagreed with the district court's conclusion that the retirement statute failed to meet that standard, however, holding that "mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age." Id. at 315, 96 S.Ct. at 2568. The record contained evidence of the negative relationship between aging and the ability to perform police duties. Significantly, however, the Court justified its conclusion by placing the burden of persuasion on the police officers: "There is no indication that § 26(3)(a) has the effect of excluding from service so few officers who are in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute." Id. at 315-16, 96 S.Ct. at 2568 (footnote omitted). Thus, although the relationship between aging and diminished ability to perform was not invariable, the patrolmen attacking the statute had failed to demonstrate that the relationship on which the statute was undeniably based was actually unfounded in a significant number of cases.
 
 
 15
 The Court has recently examined a compulsory retirement statute in Vance v. Bradley. The Court rejected an equal protection attack on a federal statute requiring retirement at age sixty by employees covered by the foreign service retirement system, even though another statute allowed civil service personnel to work until age seventy.[11] The Court again noted the absence of a fundamental interest or a suspect class, and applied the rational basis standard. 440 U.S. at 97, 99 S.Ct. at 943. In concluding that the statutory schema serves a rational basis, the Court reasoned that the mandatory retirement age of sixty attempts to "stimulat(e) the highest performance in the ranks of the Foreign Service by assuring that opportunities for promotion would be available despite limits on the number of personnel classes and on the number of positions in the Service." Id. at 101, 99 S.Ct. at 945. It concluded that the mandatory retirement provision is not invalid because it is rationally related to the goal of high performance. Id. at 102, 99 S.Ct. at 946.
 
 
 16
 This case also must be examined under the rational basis test. As the Court noted in Murgia, a class of persons composed of the elderly is not a suspect class. 427 U.S. at 313, 96 S.Ct. at 2566. Nor is the interest of appellees in public employment a fundamental interest. Id. Therefore, the standard by which we must review this provision of the Pennsylvania Constitution is the one employed in Vance v. Bradley :
 
 
 17
 The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.
 
 
 18
 440 U.S. at 97, 99 S.Ct. at 943 (footnote omitted). Having thus ascertained the proper standard for reviewing Article V, § 16(b), we must now examine the district court's reasons for holding it violative of the equal protection clause.
 
 B.
 
 19
 In its discussion of the equal protection contention, the district court properly acknowledged that "strict judicial scrutiny" is an inappropriate test in this context and that the proper scope of review is the "relatively relaxed" rational basis standard employed in Murgia. Even though it accepted the rational basis test, however, the district court concluded that no rational basis exists for the state constitutional provision. The court's analysis took as its major premise that the only basis for the state provision is its assumption that judges who are over seventy are unable to perform satisfactorily. 478 F.Supp. at 1008. Thus, the district court stated that "the record contains no proof of a relationship between advancing age and ability to perform the duties of a judge. On the contrary, the evidence before me belies the existence of any such relationship." Id. at 1014. Proceeding on this extremely limited view of the purpose of § 16(b), the court reached two intermediate conclusions to justify its ultimate determination of unconstitutionality. First, it concluded that the plaintiffs had met their burden of showing that judges who are aged seventy are not senile and are capable of performing their work. In the court's words, " 'the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' " Id. at 1014 (quoting Vance v. Bradley, 440 U.S. at 111, 99 S.Ct. at 950).[12] Second, the court cited the provisions allowing judges over age seventy to perform as "senior judges" as sufficient proof that the state does not actually perceive any relationship between advanced age and judicial incompetence. 478 F.Supp. at 1014.[13]
 
 C.
 
 20
 Sound formal logic unquestionably inheres in the district court's analysis. The conclusion unerringly flows from its premises. But the court erred in choosing as its major premise that the basis of § 16(b) is the inability of judges over the age of seventy to perform their judicial duties. Its subsequent analysis falters because the assumed basis for the constitutional convention's action misses by a wide mark the reasons set forth in the report of the Judiciary Subcommittee.
 
 
 21
 Moreover, by insisting that the appellants assume the burden of proving a rational relationship between the statute and a legitimate legislative goal, 478 F.Supp. at 1014, the district judge failed to heed the precise teachings of Vance v. Bradley :
 
 
 22
 In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker (citations omitted). As we have said in a slightly different context:
 
 
 23
 "The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was 'pure speculation.' "440 U.S. at 110-11, 99 S.Ct. at 950 (quoting Brotherhood of Locomotive Firemen & Enginemen v. Chicago, R. I. & P. R. Co., 393 U.S. 129, 138-39, 89 S.Ct. 323, 328, 21 L.Ed.2d 289 (1968)). See also Murgia, 427 U.S. at 315-16, 96 S.Ct. at 2568.
 
 
 24
 In sum, the district court erroneously placed a burden on the appellants to rebut a limited argument presented by the appellees. The correct approach would have been to require the appellees to prove that the Pennsylvania Constitutional Convention had no reasonable basis for believing the four reasons stated for the adoption of the mandatory retirement provision. See Vance v. Bradley, 440 U.S. at 112, 99 S.Ct. at 951. We conclude that the purposes actually given for the provision are legitimate and do have a rational relationship to the mandatory retirement age.
 
 
 25
 Reference Manual No. 5 listed four separate reasons in support of the provision, not one of which corresponds to the reason accepted by the district court as its major premise. First, by utilizing senior judges in part-time post-retirement service, the mandatory retirement plan substantially increases judicial manpower by bringing in younger judges while retaining the part-time services of willing and able retired judges. The legislative interest in reducing court congestion is certainly a legitimate state interest. See Administrative Office of Pennsylvania Courts, 1978 Annual Report 26, 27, 32. Even the district court's findings of fact demonstrate that retired judges have contributed significantly to the administration of justice in Pennsylvania. See note 13 supra. The conclusion is therefore inescapable that the constitutional provision is rationally related to the legitimate state interest specified in Reference Manual No. 5.
 
 
 26
 The second reason, that mandatory retirement eliminates the unpleasantness of selectively removing aged and disabled judges, and the third reason, that prevention of harm by a few senile judges more than offsets loss of judges who retain full powers past normal age, may be considered together. We cannot say that it would be irrational for Pennsylvania to be concerned with senility among state judges. Removal of individual judges for any reason has proved exceptional. During the ten year period from 1969 through 1978, only one common pleas court judge was removed from office for any reason. Even if the removal process were largely effective, the constitutional convention could have rationally agreed that "one bad Judge can undo the efforts of a hundred excellent Judges," see note 7 supra, and then concluded from this premise that mandatory retirement would both remove the senile and place a limit on the tenure of judges afflicted with other types of incompetence. In addition, the convention could rationally place a premium on avoiding the unpleasantness and public humiliation associated with individual removal. See Reference Manual No. 5, supra note 1, at 203-04.
 
 
 27
 Fourth, the provision conforms to the recommendations of the American Bar Association, the Pennsylvania Bar Association, and the National League of Cities, and corresponds with the current trend toward mandatory retirement at seventy in other public and private employment. If uniformed state patrol officers, see Murgia, 427 U.S. at 315, 96 S.Ct. at 2567, and foreign service personnel, see Vance v. Bradley, 440 U.S. at 101, 99 S.Ct. at 945, can be subjected to mandatory retirement, we have little difficulty sustaining as rational a retirement provision applicable to state judges. Indeed, in trying to conform the age for retirement of judges with the age for retirement of other state personnel, the convention could have placed heavy emphasis on treating individuals of the same age in a similar manner.
 
 
 28
 It bears repetition that the convention's judiciary committee did not defend the amendment on the basis accepted by the district court, that judges over seventy are unable to perform judicial duties satisfactorily. We therefore determine the district court's analysis to be deficient because it rests on a fundamental mischaracterization of the purpose of § 16(b). Pennsylvania has attached special importance to increasing judicial manpower, to eliminating the unpleasantness of removing senile judges on an individual basis, to preventing the harm to litigants and to the entire judicial system caused by a few senile judges, and to conforming with a trend toward mandatory retirement in other private and public employments, and we believe its assessment is rational. "Whether or not individual judges may agree with this assessment, it is not for the courts to reject it." Vance v. Bradley, 440 U.S. at 106, 99 S.Ct. at 948.
 
 
 29
 As a federal court reviewing a state constitutional provision under the equal protection clause, we may not demand perfection. Phillips Chemical Co. v. Dumas Independent School Dist., 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384 (1960), or "mathematical nicety," Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). All we can do is determine whether the provision is rationally related to achieving a legitimate state objective. Vance v. Bradley, 440 U.S. at 97, 99 S.Ct. at 943. Appellees' case condenses to their argument that judges over seventy are as reliable as judges under seventy. But the truth of this proposition does not establish a denial of equal protection. So long as a rational basis can be identified, and we can identify several here, our task is at an end. We conclude that Article V, § 16(b) does not violate the equal protection clause.[14]
 
 III.
 
 30
 But the bulk of the district court's analysis was its acceptance of the appellees' theory that § 16(b) violates the due process clause. The court struck down the provision under a concept of substantive due process, described in some Supreme Court decisions in the early seventies as "the irrebuttable presumption doctrine." This conceptual framework requires careful analysis for proper application, as is now clear from Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and Gurmankin v. Costanzo, 556 F.2d 184 (3d Cir. 1977).
 
 A.
 
 31
 Of uneasy definition and uncertain status, the doctrine emanates from a series of Supreme Court decisions from 1971 to 1974. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); United States Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). Each of these cases involved a statute containing rules that denied a benefit or placed a burden on all individuals possessing a certain characteristic. The characteristic is the basic fact from which a presumed fact is inferred. These decisions held that if it "is not necessarily or universally true in fact" that the basic fact implies the presumed fact, Vlandis v. Kline, 412 U.S. at 452, 93 S.Ct. at 2236, then the statute's irrebuttable presumption denies due process of law.[15] Its very name suggests an analysis grounded on formal logic, and a careful examination of the Supreme Court decisions that have applied it supports the conclusion that the doctrine is but another way of stating that a presumed fact must be based on reason, and that if a plaintiff demonstrates that the inference is not "rationally related" to a legitimate legislative classification, the inference will not pass constitutional muster. The decisions also suggest that in appropriate cases the classification must serve a compelling state interest.
 
 
 32
 The five Supreme Court decisions that have employed the irrebuttable presumption analysis can be divided into two categories. The first category includes Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and United States Department of Agriculture v. Murry, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973), each of which invalidated a classification adopted as an administrative device to serve as evidence of another classification. In Bell, the Court examined a Georgia procedure that mandated revocation of a driver's license if he had no liability insurance, was involved in an accident, and failed to post cash or bond in the amount of a claimant's alleged damages. In holding that the procedure violated the due process clause, the Court noted that before the driver could actually be held liable for the claimant's injuries, he would have to be adjudged negligent in the Georgia courts. But by revoking his license prior to this finding of negligence, the procedure "adjudicates important interests of the licensees." 402 U.S. at 539, 91 S.Ct. at 1589. Failure to accord an opportunity to rebut the presumption of fault thus violated the due process clause. By applying a general presumption that uninsured drivers who are involved in accidents will be held liable for those accidents, the procedure classified an individual driver as negligent even when "there is no reasonable possibility of a judgment being rendered against the licensee . . . ." Id. at 540, 91 S.Ct. at 1590 (emphasis added). The Court implicitly determined that the procedure lacked a rational relationship to the designated objective.
 
 
 33
 In Vlandis, the Court examined a Connecticut statutory presumption that all out of state applicants to state colleges were nonresidents for purposes of calculating tuition and would remain nonresidents for as long as they were students in Connecticut. The ultimate issue to be determined for each student was his or her residence, but the statute authorized a short-cut to this determination without providing the students an opportunity to controvert the conclusion. 412 U.S. at 445-46, 93 S.Ct. at 2233. Once again, the procedure attempted to reach conclusions about an individual's status by examining a particular set of circumstances that bore no necessary relationship to the classification. The Court concluded that "(t)he State can establish such reasonable criteria for in-state status as to make virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates." Id. at 453-54, 93 S.Ct. at 2237 (emphasis added). As we read Vlandis, the Court's decision rests on its determination that the presumption of nonresidence was not rationally related to the state's objective.
 
 
 34
 In Murry, the Court held invalid a regulation that denied food stamps to any household consisting of one or more persons over eighteen years of age who had been claimed as a dependent on a federal income tax return filed within the preceding two years by taxpayers who were themselves ineligible to receive food stamps. The legislative history of the provision indicated a congressional concern that nonneedy households were participating in the food stamp program. 413 U.S. at 512-13, 93 S.Ct. at 2835. The Court determined that the provision had no relation to the actual need of the persons affected, id. at 513, 93 S.Ct. at 2835, and concluded that "the deduction taken for the benefit of the parent in the prior year is not a rational measure of the need of a different household with which the child of the tax-deducting parent lives . . . ." Id. at 514, 93 S.Ct. at 2836 (emphasis added). Once again, the Court used the rational basis analysis.
 
 
 35
 Bell, Vlandis, and Murry should not be expanded beyond their context. They involved administrative short-cuts by which individuals were determined to be ineligible for benefits. The ultimate criteria for eligibility were unchallenged in all three cases; the challenges were to the use of proxies to prove the ultimate criterion. In each case, the Court struck down the procedure because the proxy was not reasonably related to the ultimate criterion. As noted earlier, the Pennsylvania constitutional provision at issue in this case attempts to serve four specific interests of the system, with the qualifications of each individual judge being unrelated to those interests. The provision does not use age seventy to reach a conclusion about individual judges. It uses that age to further important system-wide objectives. When a judge reaches age seventy, important interests of the system demand that even competent judges retire. Therefore, Bell, Vlandis, and Murry are not controlling here. See Weinberger v. Salfi, 422 U.S. at 771-72, 95 S.Ct. at 2470.
 
 
 36
 The second category contains Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). In both cases, the Court noted that the procedures implicated fundamental interests of the affected individuals. In Stanley, an unwed father sought to obtain custody of his children after their mother died. The statutory definition of "parent" applicable to custody disputes excluded natural fathers of illegitimate children, thus precluding Stanley, who had never been judged unfit to have custody, from obtaining custody. In striking the procedure, the majority recognized that "(t)he Court has frequently emphasized the importance of the family." 405 U.S. at 651, 92 S.Ct. at 1212. Similarly, in LaFleur, the Court struck down regulations requiring mandatory maternity leave for school teachers. Again noting that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," 414 U.S. at 639-40, 94 S.Ct. at 796 (citations omitted), the Court concluded that the overly restrictive maternity leave regulations "can constitute a heavy burden on the exercise of these protected freedoms," id. at 640, 94 S.Ct. at 796, for which the state could advance no justification. See also Turner v. Department of Employment Security, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975) (per curiam). Even assuming that the Court's analysis in Stanley and LeFleur employed "strict scrutiny" rather than the rational basis standard, the existence of fundamental interests in those decisions distinguish them from this case.
 
 
 37
 We affirmed a district court order that employed the irrebuttable presumption analysis in Gurmankin v. Constanzo, 556 F.2d 184 (3d Cir. 1977). We relied on LaFleur in holding that a blind teacher was entitled to demonstrate her competence to teach an English course in the Philadelphia public schools. Although no fundamental interest or suspect class was implicated in Gurmankin, the court reasoned that the school district's policy of using blindness as an indication of competence violated due process by not allowing Gurmankin to demonstrate that she was actually competent. Id. at 187. In effect, the policy was not rationally related to the legitimate state goal of assuring teacher competence. "The very point of this case is that (by) denying Gurmankin the opportunity to take a qualifying exam, the defendants deprived her of the opportunity to present evidence of her qualifications." Id. at 187 n.5. Absent the fundamental interest involved in LaFleur, however, Gurmankin is more akin to the first category of irrebuttable presumption decisions, and should not control here because the qualifications of the judges are not at issue under § 16(b).
 
 
 38
 As with any aspect of substantive due process, a court using the irrebuttable presumption doctrine must apply the rational basis test, or in appropriate cases, strict scrutiny. Otherwise, the courts would be resorting to blatant "Lochnerism," see Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), a concept that has been administered suitable last rites and mercifully interred. See North Dakota State Board of Pharmacy Snyder's Drug Stores, Inc., 414 U.S. 156, 164-67, 94 S.Ct. 407, 412-14, 38 L.Ed.2d 379 (1973); Lincoln Federal Labor Union v. Northwestern Iron & Metal Co., 335 U.S. 525, 536, 69 S.Ct. 251, 257, 93 L.Ed. 212 (1949).[16]
 
 
 39
 Thus, we do not read the irrebuttable presumption decisions as deviating substantially from the traditional tests for violations of the due process clause. Because no suspect class or fundamental interest is implicated in this case, we must apply the standard as explained in Weinberger v. Salfi, 422 U.S. at 777, 95 S.Ct. at 2472-2473:
 
 
 40
 (T)he question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in Mourning (v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973)). Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.
 
 
 41
 See also Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 23-24, 96 S.Ct. 2882, 2896, 49 L.Ed.2d 752 (1976); Marshall v. United States, 414 U.S. 417, 427-28, 94 S.Ct. 700, 707, 38 L.Ed.2d 618 (1974); Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960).[17] We must determine whether the Commonwealth of Pennsylvania could have rationally concluded that a mandatory retirement age of seventy for its judges would promote the policies specified in the legislative history of Article V, § 16(b).[18]
 
 B.
 
 42
 In applying the irrebuttable presumption doctrine to this case the district court assumed erroneously that the major, if not the only, justification for § 16(b) is the determination that judges over age seventy are unfit to judge. It then reasoned that because this presumed fact is not necessarily true, the provision offends the due process clause. The district court's logic is again unassailable, but its understanding of the constitutional convention's reasons for § 16(b) is imperfect. This error results in no small measure from the failure of appellants to defend properly, before this court and the trial court, the action of Pennsylvania's Constitutional Convention. This failure is evident from the district court's discussion of what it described as "several lesser justifications (advanced by appellants) for the mandatory retirement rule."
 
 
 43
 First, the Commonwealth submits that the present system serves the purpose of "updating the judiciary by infusion of 'new blood' knowledgeable in modern trends in the law." The defendants have offered no evidence, however, to show that elderly judges are any less cognizant of modern legal trends than their younger counterparts. In fact, quite the opposite may be true. The record contains numerous references to the benefits which the judicial system derives from the wisdom and experience of former and retired judges who serve as senior judges. See, e. g., Statement of Chief Justice Eagen Relative to Amendment of Pa.R.J.A. 701(a), October 5, 1977; see also Exhibit P-6. Absent persuasive supporting evidence, an intrusion on constitutional rights cannot be justified by the proposition that new blood is better than old blood.
 
 
 44
 The state further submits that the present system of mandatory retirement provides opportunities for elevation to the bench; avoids the difficulty of determining an individual judge's competence; and provides certain notice of upcoming judicial vacancies. While each of these purposes may be arguably legitimate, they are all matters of mere administrative convenience. Each can be amply served by other measures which do not infringe on constitutionally protected rights. "(A)dministrative convenience alone is insufficient to make valid what otherwise is a violation of due process of law." LaFleur, supra, 414 U.S. at 647, 94 S.Ct. at 799.
 
 
 45
 478 F.Supp. at 1010. Although appellants repeat these and similar arguments before us, fortified with citations of case law, see Brief for Appellants at 17, these arguments miss the important issue in this case: Is the mandatory retirement age rationally related to the accomplishment of any legitimate state objective?
 
 C.
 
 46
 The basic error committed by the district court in its due process discussion was the same one committed in its equal protection discussion; it proceeded on the premise that "(t)he principal justification advanced by the Commonwealth for this rule is 'the removal of unfit judges from the bench by means of mandatory retirement at age seventy'." 478 F.Supp. at 1008. We have previously demonstrated in Part II, supra, that the premise on which the court relied is invalid.
 
 
 47
 In reviewing § 16(b) under the due process clause, we must examine all legitimate objectives that the commonwealth could have considered to determine if any of them are rationally served by the provision. The district court's analysis of but one of the objectives, without considering the objectives explicitly stated in the reports of the drafters, does not comply with this precept. We have examined the provision in light of the four purposes contained in the Committee Report, and for the reasons detailed in Part II, supra, we conclude that § 16(b) is rationally related to legitimate legislative objectives.[19]
 
 IV.
 
 48
 Accordingly, we will reverse the judgment of the district court and remand these proceedings with a direction to enter judgment in favor of the appellants.
 
 
 
 [1]
 Judiciary Subcomm. of the Preparatory Comm. for the Pennsylvania Constitutional Convention, Reference Manual No. 5, at 199 (1968) (hereinafter cited as Reference Manual No. 5). Reference Manual No. 5 is reprinted in App. at 312a
 
 
 [2]
 Id. at 199
 
 
 [3]
 Preparatory Comm. for the Pennsylvania Constitutional Convention, Reference Manual No. 1, at 50 (1968) (hereinafter cited as Reference Manual No. 1)
 
 
 [4]
 Reference Manual No. 5, supra note 1, at 202 (citing Summaries of Judicial Salaries and Retirement Plans, 49 J.Am.Jud.Socy. 168 (Feb. 1966))
 
 
 [5]
 Reference Manual No. 5, supra note 1, at 203-04
 
 
 [6]
 ABA Model State Judiciary Article § 6, P 2, reprinted in Reference Manual No. 5, supra note 1, at 394, 398
 
 
 [7]
 Reference Manual No. 5, supra note 1, at 203. Bernard G. Segal, Esquire, representing the Pennsylvania Bar Association, observed in his statement before the committee:
 It is regrettable, but grimly true, that one bad Judge can undo the efforts of a hundred excellent Judges, and this is greatly accentuated during these days when factors beyond the control of any Judge, like those causing delays of four or five years in the trial of a case in Philadelphia, create general dissatisfaction with our judicial system. . . . (E)ven a very few unfit Judges constitute a serious impediment to the efficient administration of justice.
 Preparatory Comm. of the Pennsylvania Constitutional Convention, Testimony at Public Hearings and Other Statements: Judiciary 18 (1967-1968) (Statement of Bernard G. Segal on behalf of the Pennsylvania Bar Association).
 
 
 [8]
 Reference Manual No. 5, supra note 1, at 203
 
 
 [9]
 Stipulation Numbers 75 and 76, App. at 342a
 
 
 [10]
 The provision was included in the original draft presented to the convention by the Judiciary Committee chaired by Governor William W. Scranton and Gustave Amsterdam. I Debates of the Pennsylvania Constitutional Convention of 1967-1968 at 444 (Feb. 5, 1968) (hereinafter cited as Debates). Section 16(b) was first set forth as § 14(b). There was no floor discussion of the section during the first and second consideration of the draft on the convention floor
 During the third consideration of the judiciary article the co-chairman of the Judiciary Committee Retirement Subcommittee stated
 that men who have attained 70 may be, both physically and mentally, extremely competent and may conceivably give something of everlasting significance to the judiciary. In accordance with this, the committee recommended that these judges who are over 70 years of age, although they were retired, could be used by the Supreme Court on temporary assignments throughout the Commonwealth.
 II Debates, supra, at 1078 (remarks of Delegate Filson).
 
 
 [11]
 By the time the decision in Vance was rendered, the retirement age for civil service personnel had been eliminated. 440 U.S. at 96, 99 S.Ct. at 942
 
 
 [12]
 The district court apparently based this conclusion on findings of fact numbered 70 and 71, which state:
 
 
 [70]
 The mere fact that a judge reaches the chronological age of 70 does not affect his ability to perform his judicial duties and the vast majority of judges reaching the age of 70 are capable of continuing to perform those duties. See testimony of Doctors Obrist and Gorson, and Exhibits P-1, P-2, P-3, and P-4
 
 
 [71]
 Persons, such as judges, who achieve success in learned professions are likely to retain their mental abilities for considerably longer periods of time than the population at large
 
 
 [478]
 F.Supp. at 1006
 
 
 [13]
 This conclusion apparently derives from finding of fact numbered 73, which states: "The service of senior judges called back to perform duties has been essential to the administration of the court system in Pennsylvania in general and the court system in Philadelphia in particular." Id. at 1006
 
 
 [14]
 The district court also relied on the lower rates at which senior judges are paid, characterizing the mandatory retirement system as "merely a thinly veiled scheme for acquiring cheap judicial labor." 478 F.Supp. at 1015. Having concluded that mandatory retirement per se does not violate the equal protection clause, we need only note that the legislature could rationally conclude that the state's need for part-time judicial manpower could be filled by paying a per diem rate lower than the daily salary paid to full time judges. In addition, the legislature could consider the state judicial pensions available to most state judges. This is additional compensation available to senior judges but not available to active judges. Although we may agree that compensation for senior judges is not generous, that fact is not relevant to a determination of whether retirement at age seventy, per se, has a rational basis
 
 
 [15]
 Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv.L.Rev. 1534, 1534-36 (1974)
 
 
 [16]
 In Lincoln Federal Labor Union, in which the Court upheld state laws prohibiting union security agreements, the Court noted:
 This Court beginning at least as early as 1934, when (Nebbia v. New York, 291 U.S. 502 (, 54 S.Ct. 505, 78 L.Ed. 940) (1934)) was decided, has steadily rejected the due process philosophy enunciated in the (Adair v. United States, 208 U.S. 161 (, 28 S.Ct. 277, 52 L.Ed. 436) (1908) and Coppage v. Kansas, 236 U.S. 1 (, 35 S.Ct. 240, 59 L.Ed. 441) (1915)) line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. (citations omitted). Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.
 335 U.S. at 536-37, 69 S.Ct. at 257.
 
 
 [17]
 We are not unaware of the confusion caused by the irrebuttable presumption doctrine, particularly with regard to selection of the appropriate standard of judicial review of legislation attacked under the doctrine. The United States Court of Appeals for the Seventh Circuit, in a case virtually identical to this one, has concluded that the irrebuttable presumption analysis has been tacitly abandoned by the Supreme Court. Trafelet v. Thompson, 594 F.2d 623, 629-30 (7th Cir.), cert. denied, 444 U.S. 906, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979). The Court of Appeals for the Second Circuit has deemed the doctrine merged into the equal protection clause except with respect to fundamental interests or suspect classifications. Johnson v. Lefkowitz, 566 F.2d 866, 869 (2d Cir. 1977)
 In Gurmankin v. Constanzo, 556 F.2d 184 (3d Cir. 1977), we indicated that the Supreme Court in Weinberger had distinguished LaFleur because Weinberger involved government benefits. Id. at 187 n.5. Although this case does not involve government benefits, we are convinced that Weinberger's standard of review applies because it merely restates the well-accepted standard of review for due process challenges. In the context of government economic regulation, see, e. g., Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 23-24, 96 S.Ct. 2882, 2896, 49 L.Ed.2d 752 (1976), government benefit payments, see, e. g., Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435 (1960), and legislation that is difficult to classify, see, e. g., Marshall v. United States, 414 U.S. 417, 427-28, 94 S.Ct. 700, 707, 38 L.Ed.2d 618 (1974), the Court has applied the rational basis test. Even if we assume that mandatory retirement legislation is sui generis, cf. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 18, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973) (equal protection attack on Texas school financing system "in significant aspects is sui generis "), the rational basis test is still appropriate absent a fundamental interest or suspect class.
 
 
 [18]
 Were we to deem classifications based on age subject to strict scrutiny, we would place a wide range of state legislation in question. Any statute that uses age as a qualification creates an irrebuttable presumption that persons over or under the specified age are unqualified. E. g., minimum ages for obtaining a driver's license, consumption of alcoholic beverages, and child employment. A further anomaly would arise because the United States Constitution itself creates irrebuttable presumptions based on age. See U.S.Const. Art. I, § 2, cl. 2 (minimum age of twenty-five to serve in the House of Representatives); id. § 3, cl. 3 (minimum age of thirty to serve in the Senate); id. Art. II, § 1, cl. 5 (minimum age of thirty-five to serve as President); id. Amend. XXVI, § 1 (minimum age of eighteen to vote). Cf. id. Amend. XXII, § 1 (maximum of two terms as President). The history and widespread use of age classifications, as well as their constitutional sanction, militate against strict scrutiny of such classifications
 
 
 [19]
 Decisions of other courts support both of our conclusions, that mandatory retirement for state court judges violates neither the due process clause nor the equal protection clause. Trafelet v. Thompson, 594 F.2d 623 (7th Cir.), cert. denied, --- U.S. ----, 100 S.Ct. 219, 62 L.Ed.2d 142 (1979); Rubino v. Ghezzi, 512 F.2d 431 (2d Cir. 1975) (per curiam); Boughton v. Price, 70 Idaho 243, 215 P.2d 286 (1950); O'Neil v. Baine, 568 S.W.2d 761 (Mo.1978); Nelson v. Miller, 25 Utah 2d 277, 480 P.2d 467 (1971); Aronstam v. Cashman, 132 Vt. 538, 325 A.2d 361 (1974)