Terry MAYS

v.

**SCRANTON CITY POLICE
DEPARTMENT et al.**

Civ. No. 79–271.

United States District Court,
M. D. Pennsylvania.

Aug. 15, 1980.

**1256**

O. Randolph Bragg, David E. Heisler, Scranton, Pa., Diane M. Fitze, Tunkhannock, Pa., for plaintiff.

Thomas J. Foley, Jr., Scranton, Pa., Bradley L. Mallory, Harrisburg, Pa., Peter P. Tayoun, Patrick Lavelle, Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

May the Commonwealth of Pennsylvania authorize the removal of an unlicensed, uninspected and unattended motor vehicle without prior notification to its owner?

---

May the Commonwealth condition release of the vehicle upon payment of towing and storage costs without first affording the owner an opportunity to contest the justifications for the removal? These are the dispositive issues presented to the court on stipulated facts and cross-motions for summary judgment. After careful consideration of the parties' respective arguments, and close examination of the pertinent authorities, I have concluded that the seizure of plaintiff's vehicle without prior notice was *not,* under the facts of this case, unconstitutional, but that retention of the automobile for non-payment of towing and storage fees without an opportunity for a hearing to determine the propriety of the removal violated the Fourteenth Amendment's proscription against governmental appropriation of private property without due process.

### I.

This lawsuit focuses on the interplay of several sections of the Pennsylvania Vehicle Code.[1] It seems therefore appropriate to precede a recitation of the material facts with a detailed examination of the pertinent statutory provisions.

### A. *Statutory Background*

Under section 102 of the Vehicle Code, 75 Pa.Cons.Stat.Ann. § 102 (Purdon 1977), a motor vehicle "without a valid registration plate or certificate of inspection left unattended on or along a highway[2] ..." is considered "abandoned."[3] Section 3352(c) authorizes removal of an abandoned vehicle "to a nearby garage or other place of safety" at the direction of any police officer.[4]

---

1. Act of June 17, 1976, Pa.Laws 162, No. 81, 75 Pa.Cons.Stat.Ann. §§ 101, et seq. (Purdon 1977).

2. A highway under the Vehicle Code is defined as follows:

    The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel. The term includes a roadway open to the use of the public for vehicular travel on grounds of a college or university or public or private school or public or historical park.

    75 Pa.Cons.Stat.Ann. § 102 (Purdon 1977).

3. Section 102 also identifies as abandoned a vehicle

    that is inoperable and is left unattended on public property for more than 48 hours; that has remained illegally on public property for a period of more than 48 hours; ... or that has remained on personal property without the consent of the owner or person in control of the property for more than 48 hours.

4. Section 3352(c) also authorizes removal of a motor vehicle under any of the following circumstances:

Where possible, notice by certified mail and an opportunity for "explanation" are to precede the removal of an abandoned vehicle; if the identity of the owner of the apparently abandoned vehicle cannot be ascertained, the required notice may be secured to the vehicle. *See* 75 Pa.Cons.Stat. Ann. § 3352(d) (Purdon 1977).[5] Thus, where practicable, an owner has the opportunity to forestall removal of the vehicle, and his failure to respond to the notice is but further evidence of abandonment.

Once the vehicle has been towed, the owner is responsible for towing and storage costs, plus a fee of $25.00. *See* 75 Pa.Cons. Stat.Ann. § 7306 (Purdon 1977).[6] Notification required by section 7305 apprises the owner of his "right to reclaim the vehicle within 30 days after the date of the notice at the place where the vehicle is being held by the salvor, *upon payment of all towing and storage charges and the fee authorized in section 7306.*"[7] 75 Pa.Cons.Stat.Ann. § 7305(b)(3) (Purdon 1977) (emphasis added). Section 7305(b) further provides that

> (1) report has been made that the vehicle has been stolen or taken without the consent of its owner.
> (2) the person or persons in charge of the vehicle are physically unable to provide for the custody or removal of the vehicle.
> (3) the person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay.
> (4) the vehicle is in violation of section 3353 (relating to prohibitions in specified places) except for overtime parking.

5. Section 3352(d) provides in pertinent part:
> (1) Prior to removal of an abandoned vehicle *bearing a registration plate by which the last registered owner of the vehicle can be determined, notice shall be sent by certified mail* to the last registered owner of the vehicle informing the owner that unless the vehicle is moved to a suitable location within five days of the date notice is mailed, the vehicle will be removed under this section and held at a suitable facility where it may be reclaimed by the owner in accordance with the provisions of section 7306 (relating to payment of costs upon reclaiming vehicle). *If the abandoned motor vehicle does not bear an identifiable registration plate, the notice may be secured to the vehicle.*
> (2) If, within the five-day period, the owner so requests, the owner shall be given an opportunity to explain to the police officer or

the notice shall "[s]tate that the failure of the owner or lienholder to reclaim the vehicle is deemed consent by the owner to the destruction, sale or other disposition of the abandoned vehicle...."[8]

The legislation does not provide any avenue other than payment of the authorized fees by which the owner can gain release of his vehicle. Specifically, there is no provision for an impartial hearing to determine the validity of the removal. After it has been towed the owner must pay the statutorily created ransom or forfeit his vehicle.

### B. *Factual Background*

Plaintiff was confronted with this choice of remitting the authorized fees or losing his car. On December 30, 1978, plaintiff's 1975 Dodge Colt was parked in the 800 block of Myrtle Street, Scranton, Pennsylvania, in the vicinity of his home. The car did not bear a registration plate, and the certificate of inspection had expired. In

> department why the owner believes the vehicle should not be moved. If the police officer or department determines that the vehicle shall, nonetheless, be moved, the owner shall be given an additional 48 hours to move the vehicle or have it moved. [emphasis added]

6. Section 7306 of the Vehicle Code provides:
> In the event the owner or lienholder of an abandoned vehicle reclaims the vehicle, the reclaiming party shall pay the costs for towing and storage, plus a fee of $25 of which $10 shall be transmitted to the department [of Transportation] by the salvor.

7. Where the last registered owner of the vehicle can be identified with reasonable certainty, notice is to be sent by certified mail. If the identity of the owner cannot be ascertained, notice is to be made by publication. 75 Pa. Cons.Stat.Ann. § 7305(a) and (c). If, however, the vehicle is valueless except for junk and the owner cannot be identified, notice by publication is not required. *Id.* at § 7309.

8. Section 7307 of the Vehicle Code provides that the Department of Transportation shall authorize the disposal of an abandoned vehicle if after 30 days from the date of the notice the owner has not reclaimed the vehicle. Section 7308 delineates the procedure for the public sale of an unclaimed vehicle.

addition, the auto was missing its left front fender.[9]

The removal of the license plate from the car prevented the Scranton City Police from readily identifying plaintiff as its owner. Although apparently not required by statute, see 75 Pa.Cons.Stat.Ann. § 3352(d)(1) (Purdon 1977), efforts were made to ascertain the owner of the automobile by running the Vehicle Identification Number (VIN) through the "CLEAN" Systems both in Harrisburg, Pennsylvania and Washington, D. C.[10] These attempts proved unsuccessful because of an error in the VIN. Thus, since plaintiff could not be identified as the owner of the '75 Dodge Colt, he was not notified by certified mail that the car was considered abandoned under the Vehicle Code and therefore subject to removal. Nor was the notice that the vehicle may be towed as abandoned secured to the car. Such notice was not made because the police had determined that the neighborhood in which plaintiff's car had been parked was unsafe and a designation that the car was considered abandoned might constitute an invitation for vandalism. Thus, the '75 Dodge Colt was towed by defendant Frank Gallucci's Two Tone Towing Service at the direction of a member of the defendant Scranton City Police Department without plaintiff having received any prior notice or an opportunity to explain why the car should not be removed.[11]

Sometime during the evening of December 30, 1978, plaintiff discovered his car was missing and contacted the Scranton City Police Department. The desk sergeant advised plaintiff that his car had been considered "abandoned" under the Vehicle Code and had accordingly been towed. Plaintiff subsequently requested defendant Gallucci to release his car, but Gallucci refused, stating that he would retain custody of plaintiff's auto until the charges and fees authorized by section 7306 of the Vehicle Code had been paid. Plaintiff was either unable or unwilling to pay the charges, and his automobile remained in defendant Gallucci's possession.[12]

On March 2, 1979, plaintiff instituted the present action, seeking declaratory, injunctive and monetary relief under 42 U.S.C. § 1983.[13] Plaintiff contends that the towing of his purportedly "abandoned" automobile under section 3352 of the Vehicle Code and the de facto creation of a mechanic's lien for towing and storage charges without notice or an opportunity for a hearing constituted a deprivation of property without due process. Plaintiff also maintains that the classification of an unlicensed or uninspected motor vehicle as "abandoned" suffers from unconstitutional overbreadth because it pretermits consideration of whether the owner intended to relinquish his interest in the property.[14]

---

**9.** The parties have not indicated how long the car was parked in the 800 block of Myrtle Street in this condition.

**10.** The VIN is entered by an inspection mechanic on the certificate of inspection affixed to the vehicle.

**11.** There is no indication in the record as to the lapse of time between the law enforcement officer's initial observation of the car and his order to remove the vehicle.

**12.** Sometime in April 1979 defendant Gallucci voluntarily surrendered the car to plaintiff without payment of the charges and fees authorized by statute.

**13.** Plaintiff styled this lawsuit as a class action "on behalf of all persons who own motor vehicles which are subject to Defendants' practices and procedures for towing of allegedly abandoned motor vehicles pursuant to the Pennsylvania Motor Vehicle Code." Because plaintiff had failed to demonstrate that his claims were typical of the claims of the putative class, and because it did not appear that plaintiff was a member of the class he purported to represent, his motion for class certification was denied. See Mays v. Scranton City Police Department, 87 F.R.D. 310 (M.D.Pa.1979).

**14.** Named as defendants are the Scranton City Police Department, Paul Durkin, Chief of Police of the Scranton City Police Department, Thomas Larsen, Secretary of the Pennsylvania Department of Transportation, and Frank Gallucci, the tower who removed plaintiff's car. Plaintiff has moved for summary judgment on stipulated facts and defendants Larsen and Gallucci have filed cross-motions for summary judgment. (Defendant Gallucci's motion is captioned as a motion for dismissal under Fed. R.Civ.P. 41(b), but will be treated under Fed.R. Civ.P. 56.)

## II.

The legality of the tow and resulting detention of plaintiff's automobile necessarily depends upon the validity of the legislation that authorized the removal. Indeed, it appears that the linchpin of this entire action is the legislative classification stipulating that an unattended vehicle not bearing a registration plate is abandoned and therefore subject to removal without prior notice.[15]

Prevailing case law recognizes that seizure and detention of a motor vehicle for payment of towing and storage costs constitutes a deprivation of property that must be attended by procedural safeguards either prior to or shortly after the car is removed. *See, e. g., Stypmann v. City of San Francisco,* 557 F.2d 1338 (9th Cir. 1977); *Huemmer v. Mayor of Ocean City,* 474 F.Supp. 704 (D.Md.1979); *Hann v. Carson,* 462 F.Supp. 854 (M.D.Fla.1978); *Gillam v. Landrieu,* 455 F.Supp. 1030 (E.D.La.1978); *Remm v. Landrieu,* 418 F.Supp. 542 (E.D.La.1976); *Tedeschi v. Blackwood,* 410 F.Supp. 34 (D.Conn.1976) (three-judge court); *Watters v. Parrish,* 402 F.Supp. 696 (W.D.Va.1975); *Graff v. Nicholl,* 370 F.Supp. 974 (N.D.Ill. 1974) (three-judge court). The due process protections called for in the above-cited cases are premised upon the assumption that the legality of the tow and resulting detention is "a question 'inherently subject to factual determination and adversarial input.'" *Stypmann v. City of San Francisco,* 557 F.2d at 1343 n.18. Thus, some form of early hearing is deemed essential in order to "provide vehicle owners the opportunity to test the factual basis of the tow and . . . protect them against erroneous deprivation of the use of their property." *Id.* at 1344.

The parties in the instant action, however, seem to agree that under the Pennsylvania statutory scheme plaintiff's uninspected and unlicensed vehicle was presumptively subject to removal as abandoned without prior notice because it did not display a license plate. Under their construction of the pertinent legislative provisions there are no factual disputes that could have been contested in an adversarial hearing. Thus, plaintiff has taken the position that, although the state has a legitimate interest in towing abandoned vehicles in order to protect public health, safety, and welfare, advancement of this interest through legislation authorizing removal of a vehicle simply because it does not display a registration plate constitutes an arbitrary exercise of the state's police power.

### A.

The unarticulated premise of plaintiff's argument is that the challenged portion of section 102 creates an irrebuttable presumption that an unlicensed vehicle is abandoned and, therefore, subject to removal without prior notice.[16] If the statute is construed as creating such an irrebuttable presumption, and it is found that the presumption is not violative of the Fourteenth Amendment's due process clause, then a hearing would have been an obviously futile exercise inas-

---

**15.** It must be emphasized that the statute involved in this action requires prior notice except where the registration plate has been removed. *See* notes 2–5 and accompanying text *supra.* Such prior notification may obviate the need for more formal procedural safeguards and, therefore, the focus of the inquiry here is limited to ascertaining the constitutional implications of towing an unlicensed vehicle and forcing the owner to pay towing and storage charges before the vehicle will be released. Specifically, there is no need to consider the validity of classifying an uninspected vehicle as "abandoned" because the vehicle owner is given notice prior to towing.

**16.** Plaintiff, relying on *Gillam v. Landrieu,* 455 F.Supp. 1030, 1037–39 (E.D.La.1978), bases his challenge to the validity of the legislative clas-

sification on the overbreadth doctrine. However, since overbreadth analysis "is ordinarily invoked when a statute touches on significant First Amendment concerns," *Magill v. Lynch,* 560 F.2d 22 (1st Cir. 1977), which are not involved here, I do not believe that such an analysis is applicable. The characterization of the court's analysis, however, may be only one of form rather than substance inasmuch as both the irrebuttable presumption and overbreadth doctrines are concerned with the overinclusiveness of a governmental classification, and both utilize a two-tiered approach to the problem. (For a discussion of the bi-level approach utilized in the overbreadth area see *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The two-tiered approach employed under the irrebuttable presumption doctrine is discussed in the text *infra.*)

much as plaintiff has admitted the "basic fact" (the absence of a license plate) from which is inferred the "presumed fact" (the car has been abandoned).[17]

■ Whether a conclusive presumption of abandonment would withstand substantive due process scrutiny is problematic. Judicial review of irrebuttable presumptions appears to parallel the two-tiered approach employed to test the fundamental fairness of governmental regulations that impinge on interests referred to in the hierarchy of constitutional rights as "fundamental" and "non-fundamental."[18] *See Malmed v. Thornburgh*, 621 F.2d 565, 573–575 (3d Cir. 1980). For example, in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1973), the Court found that the "basic civil right" of procreation was impermissibly burdened by a regulation which presumed that women in their fifth or sixth month of pregnancy were unfit to serve as teachers. The Court concluded that since such a conclusive presumption is neither " 'necessarily [nor] universally true,' " compulsory maternity leaves had to be based on an individual determination that the pregnant teacher was unable to work. *Id.* at 646–48, 94 S.Ct. at 799–798. In reaching this result, the Court noted that "neither the necessity for continuity of instruction nor the state interest in keeping physically unfit teachers out of the classroom can justify the sweeping

mandatory leave regulations...." *Id.* at 647–48, 94 S.Ct. at 799. *See also Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (right to travel);[19] *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (right to conceive and raise one's children).

Conclusive presumptions dealing with "purely economic matters," however, are not subject to the demanding test of *LaFleur, Stanley* and *Vlandis. See Sakol v. Commissioner of Internal Revenue*, 574 F.2d 694, 698 (2d Cir. 1978). For example, in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Court, applying a rational relationship test, sustained legislation which conclusively presumed that a miner suffering from complicated pneumoconiosis was totally disabled as a result of the lung disease. Although requested to employ the more stringent standard of review utilized in *Vlandis* and *Stanley*, the court refused, declaring that presumptions in economic matters cannot be equated with presumptions in the mold of those cases. *See also Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (rational relationship test applied to determine the validity of conclusive legislative presumptions in the context of a noncontractual claim to receive funds from the public treasury); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318

17. For a general discussion of the irrebuttable presumption doctrine see *Note, The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 Harv.L.Rev. 1534 (1974). The continued vitality of the irrebuttable presumption doctrine has been increasingly questioned. *See, e. g., Malmed v. Thornburgh*, 621 F.2d 565, 576 n.17, (3d Cir. 1980), and cases cited therein.

18. Substantive due process analysis focuses on the interrelationship between the challenged governmental classification, the governmental interest sought to be advanced, and the constitutional interest affected by the classification. Where the affected right is "fundamental," *e. g.*, the right to vote, the right of free speech, the right to privacy, the governmental interest must be compelling, and the "legislative enactment must be narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). Where a fundamental

right is not implicated, however, the challenged law need only rationally relate to a legitimate governmental end. *See Woods v. Holy Cross Hospital*, 591 F.2d 1164, 1176 (5th Cir. 1979).

19. The Court of Appeals in *Malmed v. Thornburgh, supra*, construed *Vlandis* as involving a non-fundamental right which received protection because the governmental presumption of non-residence was not rationally related to the state's objective. *Id.* at 17–18. However, the standard enunciated in *Vlandis*, whether the presumption is universally true and whether "the State has reasonable alternative means of making the crucial determination," 412 U.S. at 452, 93 S.Ct. at 2236, sweeps beyond traditional rational relationship analysis, and it may be possible to reconcile *Vlandis* on the basis that the legislative classification implicated the right to travel. *Cf. Sakol v. Commissioner of Internal Revenue*, 574 F.2d 694, 697–98 (2d Cir. 1978).

(1973) (upholding the constitutionality of truth-in-lending rules requiring disclosure when installment purchase provides for four or more payments).

The nature of the interest at stake in the matter *sub judice* would appear to fall somewhere between those involved in *LaFleur, Vlandis,* and *Stanley,* and those implicated in *Turner Elkhorn Mining Co., Salfi* and *Mourning.* On the one hand, the courts have recognized that the interest in use and operation of a motor vehicle is substantial. *E. g., Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).[20] On the other hand, ownership and operation of a motor vehicle is legitimately burdened by numerous regulations and restrictions, including registration and inspection requirements. *See, e. g.,* 75 Pa.Cons.Stat.Ann. § 4703 (Purdon 1977). Furthermore, the legislative classification involved here implicates only a non-fundamental property right, the owner's interest in the uninterrupted use of his car.

Since the state can and does regulate the operation of motor vehicles, and since the continued use of an automobile involves a non-fundamental property right, it would appear that a legislative classification affecting the continued possession of a motor vehicle should be reviewed under the standard applied in *Weinberger v. Salfi,* 422 U.S. at 777, 95 S.Ct. at 2472:

> [T]he question raised is not whether a statutory provision precisely filters out those who are in the factual position

which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions and would be directly contrary to our holding in *Mourning [v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973)]. Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than non-members. The question is whether Congress, its concern having been aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Accord, Malmed v. Thornburgh,* 621 F.2d 565, 576–577. In sum, if the legislative classification "rationally relate[s] to the accomplishment of *any* legitimate state objective," it must be sustained. *Id.* 621 F.2d at 577. (emphasis in original).

Application of the factors relevant to a judicial assessment of rationality leads inexorably to the conclusion that the challenged portion of section 102 passes constitutional muster.[21] Classifying unlicensed vehicles as abandoned furthers the state's legitimate interests in enforcing vehicle registration laws, *see Tedeschi v. Black-*

---

**20.** *Bell v. Burson* was the "first of the recent irrebuttable presumption cases." *Note, The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534, 1540–41 (1974). The statute involved in *Bell* required revocation of a driver's license if he was involved in an accident, had no liability insurance, and failed to post cash or bond in the amount of a claimant's alleged damages. In effect, the statute created a presumption that the uninsured motorist was at fault. The Court, in holding that a pre-license suspension hearing was necessary, referred to the importance of the interest in retaining an operator's license: "Once licenses are issued ... their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees." *Id.* at 539, 91 S.Ct. at 1589.

**21.** The relevant factors are delineated in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947, 960 (7th Cir. 1979):

> Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected; whether the impairment of the private interest is effected in an area previously subjected to regulatory control; the equities of imposing the legislative burdens; and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. [citations omitted]

*wood*, 410 F.Supp. at 45; preventing traffic and safety hazards, see *Craig v. Carson*, 449 F.Supp. 385, 392 (M.D.Fla.1978), and preventing the city streets from becoming cluttered by abandoned automobiles. *Id.* Undoubtedly, the state could have chosen a more explicit, less inclusive definition for determining when an unlicensed vehicle is abandoned. It is obviously "not necessarily [nor] universally true" that an unlicensed vehicle is abandoned or constitutes a safety hazard. But it must be borne in mind that an unlicensed vehicle is only one of several types of abandoned vehicles, see note 3 and accompanying text *supra*, and, except where the vehicle does not bear any registration plate, notice prior to towing is provided. Only in the situation where the identifying insignia, the vehicle's license plate, is missing, is notice not provided. *See* notes 2–5 and accompanying text *supra*. Under these circumstances, the absence of any other statutory criteria to ascertain an intent to abandon is of no constitutional import. To hold otherwise would require "resorting to blatant 'Lochnerism,' see *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), a concept that has been administered suitable last rites and mercifully interred." *Malmed v. Thornburgh*, 621 F.2d at 575.

### B.

■■■ Thus, were I confronted with a statute that simply classified a motor vehicle without a registration plate as abandoned I would feel constrained to rule that the classification was constitutional.[22] But the statute here provides that an unlicensed *and* unattended motor vehicle is presumed abandoned, and the long-standing policy of avoiding unnecessary constitutional decisions, see *Elkins v. Moreno*, 435 U.S. 647, 661, 98 S.Ct. 1338, 1346, 55 L.Ed.2d 614 (1978), requires judicial evaluation of the word "unattended."

Since there is no controlling state court precedent concerning the challenged portion of section 102 of the Vehicle Code, this court must determine what construction would be made by the Pennsylvania Supreme Court. Literally, the word "unattended" is defined as "not attended or waited on, unaccompanied, neglected or ignored." *Webster's New World Dictionary of the American Language* (2d ed. 1972). I believe that were it confronted with the issue facing this court, the Pennsylvania Supreme Court would apply traditional canons of statutory construction, see 1 Pa.Cons. Stat.Ann. §§ 1901, *et seq.* (Purdon Supp. 1980), and define the term "unattended" as used in the challenged portion of section 102 to mean "ignored or neglected."

Under this view, section 102 may reasonably be construed as combining an objective test (whether a vehicle is without a valid registration plate) with a subjective test (whether the vehicle is left *unattended* on or along a highway). The latter test is necessarily discretionary, resting on the police officer's perception of the surrounding circumstances. Relevant factors would be the physical condition of the vehicle, the area in which it had been left, and the length of time it had remained parked in the same location. In addition, it would appear that the officer would have to consider whether under the circumstances the vehicle posed a threat to public safety or health. Accordingly, I believe that the Pennsylvania Supreme Court would require that before a car is deemed abandoned for purposes of directing its removal without prior notice, the responsible law enforcement officer must determine not only that the vehicle is unlicensed but also that the vehicle is indeed unattended.

Since towing and assertion of a *de facto* lien for towing and storage charges subjects an automobile owner to a significant deprivation, and since the question of whether a vehicle is unattended within the intendment

---

**22.** It is at least arguable that the importance of the automobile owner's interest in the uninterrupted use of his vehicle, see n.20 and accompanying text *supra*, justifies application of the more stringent standard found in *Vlandis, Stanley* and *LaFleur.* Since it is neither "necessari-

ly nor universally true" that an unlicensed vehicle is abandoned, and inasmuch as there appear to be less overinclusive alternatives available to the Commonwealth, the legislative classification would not withstand constitutional scrutiny under the more stringent test.

of section 102 is " 'inherently subject to factual determination and adversarial input,' " *Stypmann v. City of San Francisco,* 557 F.2d at 1343 n.18, an impartial hearing must be provided at some meaningful time. It is unnecessary to decide here what form of hearing is constitutionally required. "Whatever form of hearing is to be provided, and whatever form of security for the owner's presence and for the charges assessed that might be chosen, is left to the legitimate legislative prerogative of the [state legislature or] the city council." *Craig v. Carson,* 449 F.Supp. at 395. *Accord, Tedeschi v. Blackwood,* 410 F.Supp. at 46. It is sufficient to hold here that the failure to provide plaintiff an opportunity for any type of hearing denied him due process.

### III.

The finding that plaintiff was denied due process disposes of the liability portion of this action. It remains to be decided whether plaintiff is entitled to any damages as a result of the constitutional violation.

Initially, it must be noted that plaintiff is not entitled to compensatory relief based on his claim that notice should have preceded the taking. Plaintiff does not contest the reasonableness of the police officer's decision not to secure notice to the vehicle because it was parked in an unsafe area, and plaintiff's failure to affix a license plate to his car made notice by certified mail impossible. As the three-judge court in *Graff v. Nicholl,* 370 F.Supp. at 983, noted:

> An owner who fails to maintain the identification required by law, and thus precludes a reasonably expeditious record search which might identify him, cannot persuasively complain when his automobile is towed without notice as an abandoned vehicle. Such lack of diligence on an owner's part justifies postponement of notice until after towing, if notice is possible at all.

*See also Tedeschi v. Blackwood,* 410 F.Supp. at 45.

■ It also bears noting that the failure to provide a post-towing hearing does not by itself entitle plaintiff to more than nominal damages of one dollar. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Plaintiff may recover damages for the loss of use of his automobile only if defendants fail to establish that the removal of his automobile was justified under the Vehicle Code. *Id.* at 260, 98 S.Ct. at 1050. In the context of this action, defendants must demonstrate that there were reasonable grounds to believe that the vehicle was unattended. If defendants show that the towing was justified, plaintiff may still recover compensatory damages for emotional distress, but only to the extent that he proves that he "actually suffered distress because of the denial of procedural due process itself." *Id.* at 263, 98 S.Ct. at 1052.

The summary judgment motions *sub judice* do not address the question of damages. Accordingly, the parties will be directed to advise the court within ten (10) days from the date of this Memorandum and Order whether the issue will be submitted on stipulated facts. If the parties cannot agree on a stipulation, an evidentiary hearing will be scheduled.

### IV.

The only other issue presently pending before the court is whether the tower, Frank Gallucci, may be retained as a defendant in this lawsuit. Defendant Gallucci argues that he may not be held individually responsible for damages because his actions were taken pursuant to state law and at the direction of law enforcement officers.

It is precisely because Gallucci removed the car pursuant to state law, however, that exposes him to liability under 42 U.S.C. § 1983. As the Court of Appeals for the Ninth Circuit in *Stypmann v. City of San Francisco,* 557 F.2d at 1341–42, noted:

> The towing company detains the vehicle and asserts the lien for towing and storage charges pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws. Thus, the private towing company is a 'willful participant' in a joint activity with the State or its agents, and there is

a 'sufficiently close nexus between the State and the challenged action of the [towing company] so that the action of the latter may be fairly treated as that of the State itself.'

*Accord, Hann v. Carson,* 462 F.Supp. 854, 868–69 (M.D.Fla.1978); *Tedeschi v. Blackwood,* 410 F.Supp. at 41–43. In sum, Gallucci clearly acted "under color of state law," *see Adickes v. Kress & Co.,* 398 U.S. 144, 169–71, 90 S.Ct. 1598, 1614–1615, 26 L.Ed.2d 142 (1970), and, because of the governmental involvement surrounding the tow and detention of the vehicle,[23] Gallucci's conduct is properly attributable to the Commonwealth as "state action." *Compare Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (absence of overt official involvement militates against finding "state action" in proposed sale under statutory warehouseman's lien).

The mere fact that a tower acts "under color of state law," however, does not necessarily make him liable to a civil rights plaintiff. A causal link between the state action and the alleged constitutional violation must be established before liability attaches. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 370–71, 96 S.Ct. 598, 603, 46 L.Ed.2d 561 (1976).

The constitutional violation found here is the failure to afford a hearing prior to the imposition of the lien for towing and storage costs. The towing itself is not the constitutional deprivation; nor can the detention of the vehicle alone be considered a denial of constitutional rights. Were an impartial decision-maker to find the removal proper, the vehicle could be held pending

payment of the authorized fees and the tower could execute the lien pursuant to the statutory scheme without violating the vehicle owner's due process rights.

Although the tower retains the vehicle and thus plays a central role in the governmental appropriation of property, he is not in a position to provide the procedural avenue by which the vehicle may be released. It is the responsibility of the law enforcement agency that directed the tow to provide the procedural safeguards mandated by the Fourteenth Amendment; the tower is not the party in the tripartite relationship of tower, city, and vehicle owner to provide the hearing. The tower merely holds the vehicle and seeks compensation for his services. His concern is not with the validity of the tow. If the removal is found illegal, the tower may presumably look to the city for remuneration; if the tow is valid, he may retain the vehicle until its owner makes payment. Thus, the real controversy is between the city law enforcement agency and the vehicle owner. The tower is the interested bystander to the dispute.

It has been decided here that the controversy must be decided after procedural guarantees have been afforded the aggrieved vehicle owner. If the necessary hearing has not been provided, it is the city's constitutional omission, not the tower's. In sum, the city police department, not the tower, "causes" the failure to afford a hearing that denies plaintiff due process. Accordingly, the cause of action against defendant Gallucci must be dismissed, leaving only the question of the Commonwealth and city defendants' liability to plaintiff for monetary relief.[24] *See Huemmer v. Mayor of Ocean City,* 474 F.Supp. 704, 711 (D.Md.

---

**23.** The plaintiff's vehicle was removed at the direction of a member of the Scranton City Police Department, and execution of the possessory lien requires authorization of the Pennsylvania Department of Transportation. *See* 75 Pa.Cons.Stat.Ann. § 7307 (Purdon 1977).

**24.** It should be noted that defendants Durkin and Larsen may raise as a bar to individual liability the qualified immunity afforded by the "good faith" defense. This affirmative defense was described in *Scheuer v. Rhodes,* 416 U.S.

232, 247–48, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974):

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with

1979); *Watters v. Parrish*, 402 F.Supp. 696, 700 (W.D.Va.1975).

## ORDER

Now, this 15th day of August 1980, in accordance with the accompanying memorandum this day filed, it is hereby ordered that:

(1) the summary judgment motion of defendant Thomas Larsen is denied;

(2) plaintiff is granted summary judgment on his claim that the detention of his automobile for payment of towing and storage fees without an opportunity to contest the grounds upon which his car was removed denied him due process;

(3) plaintiff's summary judgment motion is in all other respects denied, and summary judgment is entered in defendants' favor on plaintiff's claims that the legislative classification of abandoned vehicles is unconstitutional and that the failure to provide notice prior to the removal of his motor vehicle denied him due process;

(4) defendant Gallucci is dismissed from this action; and

(5) plaintiff shall, within ten (10) days from the date of this order, advise the court whether the issue of damages will be submitted on stipulated facts.

good faith belief, that affords a basis for qualified immunity of executive officers.

The burden is on the defendant to prove by a preponderance of the evidence that qualified immunity should attach. *See Thompson v. Burke*, 556 F.2d 231 (3d Cir. 1977); *Skehan v. Bd. of Trustees of Bloomsburg State College*, 538 F.2d 53, 59–62 (3d Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976).

> This degree of immunity would be unavailable, however, if the official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [party] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . . .

*Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). It should also be noted that the Scranton City Police Department is not entitled to the qualified immunity based on the good faith of its officials. *See Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Gurmankin v. Costanzo*, 626 F.2d 1115, 1122 (3d Cir. 1980). Finally, it appears that Eleventh Amendment sovereign immunity would foreclose a damage award against the Secretary of the Pennsylvania Department of Transportation in his official capacity. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Kimble v. Solomon*, 599 F.2d 599, 603–05 (4th Cir.), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979); *Skehan v. Bd. of Trustees of Bloomsburg State College*, 590 F.2d 470, 487 (3d Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979).